In re DIAMOND Y.

No. 2006–119–APPEAL.

Supreme Court of Rhode Island.

Feb. 27, 2007.

---

Catherine A. Gibran, Esq., Providence, for Petitioner.

Karen Clark, Esq., for DCYF.

Leo F. Manfred, Esq., Westerly, Guardian ad Litem.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Before the Court is another of a seemingly endless string of cases in which we are asked to review a Family Court judgment terminating the right of a parent to a child. The fact that these cases are so common does not diminish the human tragedy present in each and every one of them. Here, Brian Young (Young) appeals a decree of the Family Court that terminated his parental rights in relation to his daughter, Diamond. This case came before the Supreme Court for oral argument on January 23, 2007, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## I

### Facts and Procedural History

Diamond was born on February 3, 2004. Because the Department of Children, Youth and Families (DCYF) had

previously removed other children from the custody of Diamond's mother, Nicole P. (Nicole), DCYF intervened even before Diamond's birth and ordered the hospital to hold the newborn for seventy-two hours. In light of Nicole's history with the agency with respect to her other children, and because it learned that Young, the child's father,[1] had an extensive criminal record,[2] DCYF determined that Diamond should be placed in non-relative foster care[3] once the seventy-two hour period concluded.

DCYF assigned Lawrence Bartley as the caseworker for both Young and Nicole, who, at the time of birth, and for a period afterward, remained together. Bartley developed separate case plans for each parent that outlined the steps that each must take for either of them to be reunited with Diamond. Young's plan called for him to complete a psychological evaluation to determine his fitness as a parent and to undergo a substance abuse evaluation at CODAC Behavioral Healthcare. Bartley also made it clear to Young that DCYF would pay for these evaluations. The plan also included weekly visits, supervised by Bartley, for both Young and Nicole to interact with Diamond. Additionally, the case plan required Young to secure a home suitable to raise a child.

Unfortunately, Young did not meet the goals of the case plan. Specifically, he never completed the parenting evaluation or the drug and alcohol evaluation. At first, Bartley referred Young to one doctor for the parenting evaluation—even setting up the appointments for him—but Young never met with the doctor. Then, after Young expressed to Bartley that transportation problems contributed to his inability to keep appointments with the first doctor, Bartley referred Young to, and set up appointments with, a second doctor, who was reachable through public transportation. Nonetheless, Young never managed to meet with that doctor for an evaluation either. Young did make irregular visits to the CODAC facility, but he refused to sign a release form and did not complete any meaningful treatment from CODAC, even though its facility was a mere two blocks from where he was living at the time.

Young was at first faithful to the scheduled visitation with Diamond, although he did miss from time to time. But he soon faltered here as well, missing four of six scheduled visits. As a result, Bartley altered the visitation plan from weekly to biweekly. Additionally, Bartley reported that Young would sometimes nap for fifteen to forty-five minutes of his scheduled ninety-minute visits when he did attend.

Because he said he wanted to secure housing more suitable for a family, Young moved into a three-bedroom apartment with his then girlfriend. But he ran into more trouble in November 2004, when he was incarcerated for driving a vehicle without the owner's permission. He was sentenced to serve one year in the Adult

1. Nicole did not identify the father at the time of Diamond's birth. DCYF learned that Young was the father subsequent to the child's birth.

2. Young's litany of convictions prior to Diamond's birth consists of: breaking and entering and larceny, on September 2, 1992; possession of a stolen motor vehicle, on September 14, 1992; delivery of cocaine, on September 1, 1995; carrying a concealed weapon, on December 11, 1996; assault with a deadly weapon, domestic, possession of a firearm during the commission of a crime, and carrying a firearm while intoxicated, on February 10, 1998; disorderly conduct, on April 9, 2002; and receiving stolen goods, on July 18, 2003.

3. Diamond has lived with one foster family her entire life, and that family has expressed interest in adopting her.

Correctional Institutions (ACI) as a result of this transgression. At around the same time that Young was arrested, Bartley retired from DCYF, and Suzan Furtado (Furtado) was assigned to be the new caseworker. While serving time at the ACI, Young wrote a letter to Anita Butler[4] at DCYF to request visitation with Diamond at the prison.[5] Furtado was out of work for a period from late January until mid-February, during which time, Furtado testified, this letter was received. However, when she returned to work, Furtado began to make arrangements for visits between Young and Diamond at the ACI, the first of which was held on April 5, 2005. Significantly, this was the first contact between Young and Diamond since November 2004, when he was incarcerated.[6]

By February 2005, DCYF decided to pursue a termination of Young's parental rights. A petition was filed on March 30, 2005. The allegations, as related to Young,[7] asserted by DCYF to support the termination petition were as follows:

"2. The child has been placed in the legal custody of the Department of Children, Youth and Families for at least twelve (12) months; and the parents were offered or received services to correct the situation which led to the child being placed and provided further that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home.

"3. The parents have exhibited behavior or conduct that is seriously detrimental to the child, of [s]uch a duration as to render it improbable for the parents to care for the child for an extended period of time.

"4. 1. [sic] The father is unfit by reason of conduct or conditions seriously detrimental to[.]"[8]

A hearing was held before a justice of the Family Court on September 12, September 19, and October 31, 2005. Young was released from the ACI prior to the final day of the hearing.[9] He testified that he was living in a shelter and seeking employment, but that he currently had no means to provide shelter and support for his daughter, nor could he foresee when he would be able to provide such care for her, testifying that "[o] nly God can [predict her future]. She's in his care, not mine."

The hearing justice, satisfied that DCYF had met its burden of proof, granted the petition to terminate Young's parental rights on December 14, 2005, and the final decree terminating Young's rights was en-

4. Anita Butler was the DCYF supervisor in charge of both Bartley and Furtado.

5. It is unclear from the record exactly when this letter was written because it is not dated, but it appears from the record that DCYF had received the letter by February 7, 2005.

6. DCYF continued to arrange monthly visits between Young and Diamond after April 2005. It is noteworthy, though, that the petition to terminate Young's parental rights already had been filed, on March 30, 2005.

7. The termination petition sought the termination of the parental rights of both Young and Nicole. Nicole did not appear at the arraignment on April 17, 2005. She was defaulted and a decree was entered terminating her rights.

8. The termination petition that was submitted to the court ended without completing the sentence explaining the conduct or conditions that allegedly rendered the father unfit.

9. Although the first two days of the hearing took place while Young was incarcerated, he was present in the courtroom pursuant to a writ of habeas corpus.

tered on May 25, 2006. In the termination decree, the family court justice found that "[t]he father has had very little contact with the child, * * * has not supported this child in any meaningful way," and that he has not established "a proper place for the child to live, nor can he provide the court with any plan to provide the same within any realistic time." Additionally, the family court justice noted that Diamond was "in a pre-adoptive loving home," and that she was "bonded to her foster parents." Thus, the family court concluded that Young was an unfit parent and that it was in Diamond's best interest to terminate his parental rights.

## II

### Standard of Review

 The statutory provisions under which the family court justice terminated Young's parental rights are G.L.1956 § 15–7–7(a)(2)(vii) & (3). Those subsections say:

"The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

" * * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

" * * *

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home; * * *." *Id.*

"This Court employs a deferential standard of review when reviewing a Family Court decision to terminate a person's parental rights." *In re Kayla N.*, 900 A.2d 1202, 1207–08 (R.I.2006). We assign great weight to the findings of the hearing justice, and we will overturn them only if we find that he was clearly wrong. *In re Shawn M.*, 898 A.2d 102, 106 (R.I.2006). Additionally, before issuing a termination decree, the trial justice must find by clear and convincing evidence that DCYF made reasonable efforts to reunite the child with the parent. Section 15–7–7(b)(1).[10] This reasonableness determination is made on a case-by-case basis that considers the "conduct and cooperation of the parent[]." *In re Isabella C.*, 852 A.2d 550, 559 (R.I.2004). Because a parent has a right to raise a child in a less than perfect manner, the Family Court first must make a finding of

10. "In the event that the petition is filed pursuant to subdivision[] * * * (a)(2)(vii) of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family." G.L.1956 § 15–7–7(b)(1).

unfitness; once that finding has been made, the court then considers the best interests of the child. *In re Rosalie H.,* 889 A.2d 199, 204 (R.I.2006).

## III

### Analysis

Young argues on appeal that he "is not beyond reclamation as a parent," and that DCYF, and in particular Furtado, did not undertake reasonable efforts to reunify him with Diamond. To support these arguments, Young relies heavily on a "Strengths Statement" [11] written by Bartley in which he describes Young as someone who has "worked for many years[,] * * * interact[ed]. well with Diamond * * * and [has been] on time when he attend[ed] visitation." Young also suggests that the fact that no visits were scheduled from November 29, 2004, the time Furtado took over the case, until April 5, 2005, despite a written request that such visits be scheduled, is evidence that DCYF failed to make reasonable efforts to reunify him with Diamond. Nonetheless, Young does admit to many faults, and that he "has * * * lived at times in shelters unsuitable for children, and failed to undergo the parenting assessment and substance abuse evaluation asked of him by [DCYF]." Young also concedes that Bartley, the caseworker for the first nine months of Diamond's life, "offered reasonable services."

The hearing justice found that Young was an unfit parent, that DCYF made a reasonable effort to achieve reunification of father and daughter, and that the best interests of Diamond were served by terminating Young's parental rights. Our task in reviewing this termination decree is limited to discerning whether the trial

justice was clearly wrong in making those findings. *In re Shawn M.,* 898 A.2d at 106.

■■■ Young's first caseworker, Bartley, developed a case plan for Young that included referrals to multiple doctors for a parenting evaluation and direction to obtain a substance abuse evaluation at CODAC. Additionally, the case plan, the goal of which was reunification, directed Young to establish a home suitable to raise a child. Young, however, failed to avail himself of any of these services. Although he did for a brief time secure a larger apartment in Warren, his subsequent incarceration and the fact that he has lived in shelters for a large part of Diamond's life reveal that he has not established a suitable home to raise a child. And, although it is possible that Furtado could have done more during the beginning of Young's stint in the ACI to set up visits between Young and Diamond, in our opinion that possibility is not sufficient to render the hearing justice's finding that DCYF undertook reasonable reunification efforts clearly wrong. DCYF need not undertake extraordinary efforts to reunite parent and child, but reasonable efforts, as determined on a case-by-case basis, are required. *In re Kayla N.,* 900 A.2d at 1209; *see also In re Christopher B.,* 823 A.2d 301, 308 (R.I. 2003) (the extent of the reasonable efforts required of DCYF vary with the differing circumstances of the parent(s)); *In re William, Susan, and Joseph,* 448 A.2d 1250, 1255 (R.I.1982) (what constitutes reasonable efforts is determined by looking at the totality of the circumstances of each case).

The statute requires DCYF to provide services to the parent to correct the circumstances that led to the separation of

---

11. A "Strengths Statement" was a piece of the caseworker's report on the case plan that was implemented by the agency specifically to highlight the positive aspects of the parent's progress because so much of the report tended to focus on the negatives.

parent and child and to make reasonable efforts toward reunification. *See* § 15–7–7(a)(3) & (b)(1). Young faults Furtado for not being as effective as Bartley, but we do not disagree with the trial justice's conclusion that the department's overall efforts were reasonable. Indeed, Furtado testified that she made efforts to set up visits for Young at the ACI as soon as she became aware of Young's letter, but that difficulties with the ACI in scheduling those visits delayed her. There is, conversely, no evidence on the record that Young undertook any further initiative to see his daughter. We have said previously that "[t]here must be a limit to the extension of reasonable efforts." *In re Kayla N.*, 900 A.2d at 1209. In view of the fact that Bartley undertook extensive efforts to achieve reunification between Young and Diamond, all of which failed because of Young's non-compliance, any shortcomings of Furtado are minor and do not render the steps taken by DCYF as an agency inadequate. In our opinion, the hearing justice's finding that DCYF made reasonable efforts at reunification, as required by the statute, was supported by the record, and was not clearly wrong.

■ Once the Family Court determined that Young failed to avail himself of the services to which the DCYF caseworker referred him so that he could work toward curing the circumstances that resulted in the removal of Diamond from his custody, a determination that he was an unfit parent was justified by the evidence, and the hearing justice then was free to consider the best interests of the child. *See In re Rosalie H.*, 889 A.2d at 204. His finding that Diamond's best interests were served by clearing the way for potential adoption by the family with whom she had lived her entire life certainly was sound. We therefore hold that the hearing justice made no error in finding that Young was an unfit parent, that DCYF made reasonable efforts to reunify father and daughter, and that Diamond's best interests were served by terminating Young's parental rights.

IV

Conclusion

For the reasons set forth in this opinion, we affirm the decree of the Family Court, and the papers in this case are to be returned to that court.