**In re JOSE LUIS R.H.**

**No. 2008–25–Appeal.**

Supreme Court of Rhode Island.

April 15, 2009.

Catherine Gibran, Office of the Public Defender, for Petitioner.

Karen A. Clark, Esq., Providence, for DCYF.

Andrea Iannazzi, Esq., for CASA.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice FLAHERTY, for the Court.

The respondent father, Jose Luis Rivera, has appealed a Family Court decree terminating his parental rights to his son, Jose Luis R.H. This case came before the Supreme Court on March 4, 2009, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and reviewing the memoranda of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

### Facts and Procedural History

In April 2005, Rivera was incarcerated at the Adult Correctional Institutions (ACI) for a five-year term as a consequence of his convictions for one count of second-degree robbery and two counts of simple assault.[1] On April 17, 2005, Jose Luis was born, and the attending physician noted the presence of cocaine in his blood. As a result, on April 19, 2005, the infant was placed in the temporary custody of the Department of Children, Youth and Fami-

---

1. Rivera had pled *nolo contendere* and was sentenced to fifteen years imprisonment, with five years to serve, on the robbery charge and one-year suspended sentences for each count of assault.

lies (DCYF). On April 26, 2005, a Family Court justice ordered paternity testing to determine whether Rivera was Jose Luis's father. According to the DCYF social worker, Denise Gallagher, Rivera requested the paternity test.[2]

In late August 2005, the paternity test result established that Rivera was indeed Jose Luis's father. Soon thereafter, in early September 2005, the department began to provide visitation to Rivera at the ACI. The schedule provided one-hour visits on a biweekly basis. However, because of several disciplinary infractions, Rivera lost visitation privileges, including his right to visit with his infant son, for a number of days. On September 23, 2005, Rivera was written up for possession of contraband, and he lost visitation rights from October 23, 2005 to November 22, 2005. On November 14, 2005, he was cited for another infraction for failing to supply a urine specimen for drug testing. For this transgression, he again lost visitation rights, and he served time in segregation from December 28, 2005 to January 27, 2006.

On December 6, 2005, Gallagher met with Rivera to discuss a case plan for reunification.[3] Although the department prepared the case plan on December 8, 2005, it was not presented to Rivera for his signature until March 8, 2006. The case plan specified as an objective that Rivera should complete certain programs offered at the ACI for parenting, child development, and substance-free living, and that the department would provide funding and referrals as needed. The department continued to provide visitation and it kept Rivera apprised of his son's development, but it did not provide any money or referrals for programs because Rivera was incarcerated. In January 2006, Gallagher met with Rivera again and reviewed the tasks and objectives of the case plan with him. She encouraged him to get involved in the programs that were offered to inmates at the ACI. But by March 8, 2006, Rivera had not taken part in any of those programs, and he still had four years remaining to serve on his sentence.

On May 4, 2006, the department filed a petition to terminate Rivera's parental rights (TPR). The petition alleged three grounds: (1) that he was unfit under G.L. 1956 § 15–7–7(a)(2)(i) because of his imprisonment for a duration rendering it improbable that he could care for the child for an extended period; (2) that he was unfit under § 15–7–7(a)(2)(vii) because he had exhibited behavior or conduct that was seriously detrimental to the child for a duration rendering it improbable that he could care for the child for an extended period; and (3) that under § 15–7–7(a)(3), the child had been placed in the legal custody of the department for at least twelve months, had been offered and received services to correct the situation, and there was no substantial probability that the child could return safely to Rivera's care.[4]

2. The record reflects that on April 26, 2005, a Family Court justice ordered that DCYF arrange for paternity testing for Rivera. The department suggests that Rivera initially denied paternity, but we cannot discern from the record what the circumstances were that led the court to order the testing.

3. This actually was the second case plan. The first case plan for reunification only pertained to Jose Luis's mother and did not include Rivera because his paternity had not yet been established. The mother, whose parental rights were terminated on December 1, 2006, is not a party to this appeal.

4. General Laws 1956 § 15–7–7(a) provides in relevant part:

"(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal

At the time of the hearing on the department's petition, which took place in February and March 2007, Rivera submitted four certificates of completion to the court for different programs he attended at the ACI. The certificates indicated that he had participated in a conflict resolution program entitled "Boundaries for Healthy Relationships" from September 7, 2006 to November 16, 2006, as well as a program entitled "Peaceful Solution Character Education" on December 12, 2006. The certificates also demonstrated that he had completed a program on nonviolent conflict resolution in May 2006, and that he had attended a program teaching spiritual awareness from May 18, 2006 to July 27, 2006. Rivera also testified that in January 2007, he had begun a substance abuse program at the ACI, which he was continuing to attend, and that he was on the waiting list for a parenting class.

Rivera testified that his release date from incarceration was 2010, but he believed that he would be released in 2009 because of his credits for good time. He also said that he might be paroled in June 2007. Upon his release, he said, he planned to enter a residential program at the Salvation Army for six months. After that, Rivera intended to live with his sister, care for Jose Luis, obtain employment, and maintain his sobriety. He testified that he loved his son and enjoyed playing with him, feeding him, and changing him during his visits at the ACI. Rivera also told the court that the department had missed about five visits in the beginning, and to make up the lost visits, the caseworker would extend subsequent visits for a half hour. Rivera acknowledged that the social worker apprised him of his son's health. He knew that his son had been in therapy for a condition involving his legs that was the result of cocaine in his son's system at birth.

Gallagher testified that the department did not schedule visits or create a case plan until the paternity testing results confirmed that Rivera was the father of Jose Luis. She said that initially, the department had been unable to facilitate visits between Jose Luis and Rivera because the father was in segregation for disciplinary infractions and had lost his visitation privileges. She also recalled that after other missed visits, Rivera telephoned the department from his counselor's office and asked for more visits with his son. She testified that in her December 2005 meeting with Rivera, they discussed programs that he should take advantage of while at the ACI. Rivera had told her of his history of substance abuse, so she particularly

rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

" * * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

"(i) Institutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

" * * *

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

" * * *

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home * * *."

suggested that he attend substance-abuse programs, as well as parenting programs. She acknowledged that on March 8, 2006, she told Rivera that it was possible that the department would file a TPR petition because Jose Luis had been in the department's custody for almost a year. She testified that Jose Luis had been living with a loving and happy preadoptive family that still was available for his placement.[5] She related that Jose Luis had some developmental speech problems.

On August 3, 2007, the trial justice issued a lengthy and well-reasoned written decision granting the petition to terminate Rivera's parental rights under § 15-7-7(a)(2)(i) and § 15-7-7(a)(3). A decree was entered on May 22, 2008, *nunc pro tunc*. In her decision, the Family Court justice found that the department had fulfilled its obligation to make reasonable efforts under § 15-7-7(b)(2) to reunite Rivera with Jose Luis.[6] She found that due to his incarceration, the department was limited in what services it could provide, but that the department had advised him in the case plan to participate in relevant programs at the prison. Further, she found that the department provided biweekly visits once paternity was established, but because of respondent's own actions, some of the visits had been missed.

The trial justice made findings that Rivera was an unfit parent and he would be unable to provide his two-year old son with a home or a stable environment until his release from prison in 2010. Specifically, she found that he was unfit under § 15-7-7(a)(3) because Jose Luis had been in the care of the department for the statutory twelve-month term, and because of Rivera's incarceration until 2010, there was not a substantial probability that Jose Luis could return to his father's care within a reasonable period. She reasoned that the twelve month statutory period under § 15-7-7(a)(3) began to run once Jose Luis was legally in the temporary custody of the department, and there was no requirement that a finding of neglect precede the TPR petition. *See In re Delicia B.*, 762 A.2d 1201, 1203 (R.I.2000).

The trial justice also found that Rivera was unfit under § 15-7-7(a)(2)(i). She concluded that although incarceration alone would not be sufficient grounds to terminate Rivera's parental rights, the duration of his imprisonment rendered it improbable that he would be able to care for Jose Luis until 2010, and perhaps even later, considering that additional services may have been required to further assist in reunification. The trial justice, however, found that the department had not proven that Rivera had exhibited behavior or conduct seriously detrimental to the child to justify a finding of unfitness under § 15-7-7(a)(2)(vii).

---

5. Gallagher testified that Jose Luis lived with the foster family from the time the hospital discharged him until November 2006. At that time, the family moved to Florida, but the foster parents were still interested in adopting Jose Luis.

6. Section 15-7-7(b)(1) provides:
   "In the event that the petition is filed pursuant to subdivisions (a)(1), (a)(2)(i), (a)(2)(iii), or (a)(2)(vii) of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family. In the event that a petition is filed pursuant to subdivisions (a)(2)(ii), (a)(2)(iv), (a)(2)(v), (a)(2)(vi) or (a)(4) of this section, the department has no obligation to engage in reasonable efforts to preserve and reunify a family."

Finally, after she found the father to be unfit, the trial justice concluded that it was in the child's best interest to terminate Rivera's parental rights. She found that Jose Luis had been living with foster parents who loved him, who had provided him with excellent care, and with whom he could spend the remainder of his childhood if he were freed for adoption.[7]

Rivera has timely appealed the termination of his parental rights to this Court. His arguments center around three core issues. First, he contends that the trial justice clearly was wrong when she found by clear and convincing evidence that the department complied with its statutory requirement to expend reasonable efforts to reunify him with his son, Jose Luis. Specifically, he argues that the visitation schedule and case plan for reunification were insufficient to reasonably encourage and strengthen the parent-child bond. Second, he argues that the trial justice erred and was "terribly unfair" when she found that Rivera began involvement in the certificate programs around the time that the petition was filed. Third, respondent argues that the trial justice erred by terminating Rivera's parental rights because of his imprisonment "for an extended period of time" and by concluding that he was an unfit parent. Essentially, he submits that his rights were improperly terminated solely because of his conviction and subsequent incarceration. He argues that there were no other factors suggesting his unfitness as a parent, considering the persuasive evidence that he is capable of being a loving father to his son.[8]

### Standard of Review

■■ "Natural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." *In re Victoria L.*, 950 A.2d 1168, 1174 (R.I.2008) (quoting *In re Destiny D.*, 922 A.2d 168, 172 (R.I.2007)). As a result, a court must make a finding of unfitness before it may terminate the rights of a parent. *See id.* (citing *In re Destiny D.*, 922 A.2d at 172). After the trial justice makes a determination of parental unfitness, "the best interests of the child outweigh all other considerations." *In re Destiny D.*, 922 A.2d at 173 (quoting *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989)).

■ This Court "reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence." *In re Victoria L.*, 950 A.2d at 1174 (quoting *In re Ariel N.*, 892 A.2d 80, 83 (R.I.2006)). The findings of the Family Court justice are accorded "great weight" on appeal and will not be disturbed unless it can be shown that they "are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Destiny D.*, 922 A.2d at 172). Furthermore, the "natural parent's right to due process requires that the state support its allegations by at least clear and convincing evidence." *Id.* (citing *In re Destiny D.*, 922 A.2d at 172).

---

7.  After Jose Luis's foster family moved to Florida, the department sought to place Jose Luis with them out of state through a request under the Interstate Compact on the Placement of Children, G.L. 1956 § 40-15-1. On January 4, 2007, the department filed an emergency motion to allow out-of-state placement. After the Family Court granted the TPR petition, it approved the department's motion for out-of-state placement on December 12, 2007. Rivera filed a petition for writ of certiorari and a motion to stay the decision, and this Court denied both requests on December 20, 2007.

8.  Rivera does not appeal the trial justice's findings pertaining to the best interests of the child.

## Analysis

### I

### Reasonable Efforts

The first issue on appeal is whether the trial justice was clearly wrong when she found that the department had made reasonable efforts to encourage and strengthen the parental relationship between Rivera and his son Jose Luis. Rivera points to the department's delays in initiating visitation and in implementing a case plan for his reunification with Jose Luis. He contends that the department "did virtually nothing." In contrast, Rivera argues that although he was under no legal obligation to do so, he voluntarily signed up for programs at the ACI and further took the initiative to contact the department to make up his lost visits.

Absent specific circumstances, before filing a TPR petition, the department must make reasonable efforts to encourage and strengthen the parental relationship so that the child may safely return to the family. *See* § 15–7–7(b)(1); *In re Christopher B.*, 823 A.2d 301, 314 (R.I.2003). To protect the fundamental interest of natural parents, we have required that the department prove by clear and convincing evidence that it has undertaken reasonable efforts. *In re Natalya C.*, 946 A.2d 198, 203 (R.I.2008). The reasonable efforts requirement applies to petitions filed in the event that the child is placed in the legal custody or care of the department for twelve months. *See* § 15–7–7(a)(3); *In re Christopher B.*, 823 A.2d at 314. Under those circumstances, § 15–7–7(a)(3) requires a showing that the services offered amount to reasonable efforts of the department to correct the situation that led to the child's removal from the parental home, "thereby strengthening and encouraging the parental relationship, as described in § 15–7–7(b)(1)." *In re Christopher B.*, 823 A.2d at 315. "[T]he services offered or received must be designed to address or correct the situation that led to the child or children's placement in DCYF care or custody." *Id.* The reasonable efforts requirement also applies to petitions filed in the event that a parent is imprisoned so as to render it improbable that he will be able to care for his child for an extended period of time. *See* § 15–7–7(b)(1) (requiring reasonable efforts before filing petition under § 15–7–7(a)(2)(i)).

▪ " 'Reasonable efforts' is a subjective standard subject to a case-by-case analysis, taking into account, among other things, the conduct and cooperation of the parents." *In re Natalya C.*, 946 A.2d at 203 (quoting *In re Nicole B.*, 703 A.2d 612, 618 (R.I.1997)). In accordance with § 15–7–7(b)(1), the department must demonstrate that it has:

"(1) consulted and cooperated with the parent or parents in developing a plan for appropriate services to be provided to the child and his or her family, (2) made suitable arrangements for visitation, (3) provided services and other assistance to the parent or parents to ensure that problems preventing discharge from foster care would be resolved or ameliorated, and (4) informed the parent or parents about the child's health, progress, and development." *In re Nathan F.*, 762 A.2d 1193, 1195 (R.I.2000) (quoting *In re Antonio G.*, 657 A.2d 1052, 1058 (R.I.1995)).

However, "DCYF need not undertake extraordinary efforts to reunite parent and child * * *." *In re Diamond Y.*, 915 A.2d 1283, 1288 (R.I.2007).

▪ We believe the trial justice was correct when she found that overall, and under the particular circumstances of this case, the department made reasonable efforts toward reunification. The trial justice aptly considered that the department's

ability to provide Rivera services in this case was somewhat limited by his incarceration. In *In re Diamond Y.*, 915 A.2d at 1288–89, this Court addressed whether the department made reasonable efforts at reunification with a parent incarcerated at the ACI. In that case, we held that the department had made reasonable efforts despite a delay in scheduling visits. *Id.* at 1289. The Court reasoned that the difficulty of scheduling visits at the ACI, coupled with the father's lack of initiative during the period of delay, limited the extent of services that the department could provide. *Id.* Therefore, taking these circumstances into account, we said that such minor shortcomings did not render the department's efforts inadequate. *Id.* Also, in *In re Shaylon J.*, 782 A.2d 1140, 1143 (R.I.2001), under circumstances similar to this case, we held that the department had met its burden of providing reasonable efforts at reunification by developing a case plan and providing visitation, although it delayed such efforts until after the incarcerated parent's paternity was established.

Rivera faults the department for delaying the case plan, for providing insufficient visits with his son, and for missing visitations. However, the record reveals that once paternity was established, the department developed a case plan with the goal of reunification and set up a visitation schedule for the father and son to be held at the ACI for one hour on a biweekly basis. We have held that "§ 15–7–7 does not require corrective services during the time that a putative parent's biological relation to the child is in question." *In re Chaselle S.*, 798 A.2d 892, 894 (R.I.2002); *see also In re Shaylon J.*, 782 A.2d at 1143 ("The department had no obligation to create a case plan for the father until it established his paternity."). Furthermore, the trial justice found that although Rivera did not sign the case plan until March 8,

2006, the case plan nevertheless was in effect from December 2005 to June 2006. This finding is supported by the record. The department began providing visitation in September 2005, right after Rivera's paternity was established, and in December 2005, it suggested that respondent participate in parenting and substance abuse programs at the ACI. Although the department did not discuss the case plan with Rivera until early December 2005, from the time paternity was established the department provided him with biweekly one hour visits with his son, the only service it reasonably could provide while he was incarcerated.

Furthermore, when assessing the reasonable efforts of the department, we look also to the conduct and cooperation of the parents. *In re Natalya C.*, 946 A.2d at 203. As a result of Rivera's own actions, he was placed in segregation for periods in October and November 2005 and December 2005 to January 2006. The record reveals that this discipline resulted from respondent's failure to comply with prison rules; he failed to supply a urine sample for drug testing and he was charged with possession of contraband. This led him to miss some visits with his son, which certainly was no fault of the department. In his brief, however, Rivera suggests that the department failed to attend five scheduled visits soon after his paternity was established. In his testimony at the TPR hearing, Rivera testified that the department missed five visits. It is not clear from the record, however, whether the missed visits to which the respondent testified were a result of his own disciplinary segregation, his son's illness, or any failings of the department. Even if the department missed five visits, in our opinion, this would not render the department's efforts inadequate, especially in light of the fact that the department made efforts to

make up for the missed visits by extending subsequent visits. Considering the conduct and cooperation of both the department and the parent, we do not believe that the trial justice erred when she found that the department proved by clear and convincing evidence that it made reasonable efforts to encourage and strengthen the parental relationship and to address the situation that led to Jose Luis's placement in DCYF.

## II

### Rivera's Participation in Programs

The second issue on appeal is whether the trial justice erred and was clearly wrong when she found that Rivera only began to participate in programs around the time the department filed the petition. The record reveals that the social worker repeatedly suggested to Rivera in December 2005 and then again, in January 2006, that he participate in child development and parenting programs as part of his plan for reunification. Rivera contends that he did everything he could to participate in such programs, but that waiting lists and the ACI's limited classes prevented and delayed his participation.

We glean from the record that the trial justice recognized that respondent had completed four different programs by the time of trial. The trial justice specifically acknowledged that Rivera received a certificate for completing a program entitled, "Resolving Conflicts Nonviolently" in May 2006. We therefore cannot say that the trial justice clearly was wrong when she found that Rivera began participating in programs around the time that the petition was filed on May 4, 2006. Moreover, from a review of the record, it does not appear that any tardiness by Rivera in engaging in these programs was a determining factor in the trial justice's decision.

■ Also, to whatever extent the trial justice considered Rivera's lack of participation in programs, we do not believe that this was an error. We have said that a parent's refusal to cooperate with reunification services can be a factor that the court considers, along with other factors, when determining whether to issue a TPR decree. *See In re Delicia B.*, 762 A.2d at 1204; *In re Christina V.*, 749 A.2d 1105, 1110 (R.I.2000). The record discloses that on March 8, 2006, when the social worker asked Rivera about his involvement with any programs, he stated that he was not participating in any services at the time and that he still had over four years left to serve on his sentence. Although there is no evidence in the record that Rivera refused to cooperate with the department, his lack of involvement in programs related to parenting, child development, and substance abuse clearly was relevant and was a proper consideration in determining whether there was a substantial probability that the child would be able to return safely to the parent's care within a reasonable time. *See* § 15–7–7(a)(3).

## III

### Finding of Unfitness

■ The third issue on appeal is whether the trial justice clearly was wrong and erred when she terminated Rivera's parental rights because of his imprisonment "for an extended period of time" under § 15–7–7(a)(2)(i). Rivera argues that there are no other factors, other than his incarceration, that suggest his unfitness as a parent. Further, Rivera emphasizes that unlike prior cases affirming the termination of the rights of an incarcerated parent, he has proven his desire and capability of being a good and loving parent.

■ In our opinion, the trial justice was not clearly wrong in finding Rivera to be unfit under § 15-7-7(a)(2)(i). It is true that we have held that incarceration alone is insufficient to terminate parental rights, but when this is combined with other factors, such as the probable duration of incarceration, there may be sufficient grounds to support a finding of unfitness. *In re Amber P.,* 877 A.2d 608, 615–16 (R.I.2005) (citing *In re Faith H.,* 813 A.2d 55, 57 (R.I.2003)). In fact, we have said that "the extended length of a parent's incarceration is, pursuant to § 15-7-7(a)(2)(i), in and of itself, grounds to terminate parental rights." *In re Alvia K.,* 909 A.2d 498, 503 (R.I.2006). Furthermore, "[i]n calculating the period of incarceration, the [trial] justice may look to the total sentence, even if the parent is eligible for parole." *In re Amber P.,* 877 A.2d at 616 (quoting *In re Faith H.,* 813 A.2d at 57); *see also In re Mercedes V.,* 788 A.2d 1152, 1153 (R.I.2001) (mem.); *In re Shaylon J.,* 782 A.2d at 1142.

The record reflects that the trial justice did not base her findings exclusively on the respondent's conviction and subsequent incarceration. She also relied on the duration of his sentence. She considered that Rivera had been incarcerated since before the birth of Jose Luis, who at the time of the hearing already was two years old. She reasoned that if Rivera served out his entire sentence, he would not be released until February 2010. She took into account the remote possibility that reunification could occur immediately upon Rivera's release because more services would have to be provided to assist with reunification, extending the period even more. The trial justice decided not to rely on respondent's

claim that he could be released on parole at an earlier time, finding it too speculative to warrant her consideration.

■ Under these circumstances, we see no error in the trial justice's ruling. At the time of her decision, there were no assurances that respondent would be released on parole before 2010. He had nearly three years remaining to serve on his five-year sentence.[9] As a result, Jose Luis would have had to remain in foster care until he was nearly five years old and he would be deprived of the benefit of stability and permanency for a significant portion of his childhood. In light of the duration of Rivera's sentence, his child's age and development, and the uncertain home environment pending release, the trial justice was not clearly wrong when she found that Rivera's imprisonment rendered it improbable for him to care for the child for an extended period of time.

■ We appreciate that the respondent has demonstrated his love for and desire to be a parent to Jose Luis, but the fact remains that he presented no evidence of his actual ability to care for Jose Luis within a reasonable period. "[A] parent's genuine love for [his] child, or an existence of a bond between parent and child is not sufficient to overcome the child's fundamental right to a safe and nurturing environment." *In re Douglas F.,* 840 A.2d 1087, 1089 (R.I.2003) (quoting *In re Brianna D.,* 798 A.2d 413, 415 (R.I.2002)).

## Conclusion

We affirm the Family Court decree terminating the respondent's parental rights,

---

9. Although by the time of the hearing of this appeal, respondent had been released from the ACI, we review the findings of the trial justice in light of the facts that existed at the time that the Family Court rendered its decision. *See In re Tinisha P.,* 697 A.2d 622, 625 (R.I.1997).

and the papers in this case are to be returned to that court.