**Supreme Court**

No. 2013-11-Appeal.
(07-4022-3)

In re Lyric P.                                    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Lyric P.                          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**   The respondent Robert Molenda (respondent or Molenda) appeals from a Family Court decree terminating his parental rights to his son, Lyric P. (Lyric).  This case came before the Supreme Court for oral argument on March 4, 2014, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After carefully considering the parties' written submissions and oral arguments, we are of the opinion that cause has not been shown and that the issues raised by this appeal should be decided at this time.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

### I

### Facts and Travel

Lyric came to the attention of the Department of Children, Youth, and Families (DCYF or the department) on December 21, 2010, when he was born at the Women and Infants Hospital.  His mother, Caitlin Patenaude, was incarcerated at the Adult Correctional Institutions (ACI) at the time but was brought to the hospital to give birth.  DCYF was informed that the mother had tested positive for opiates and cocaine at several points during the pregnancy and had also tested

positive for methadone at the time of delivery. Lyric also tested positive for methadone at birth. DCYF noted that when Lyric was born it was in the process of terminating the mother's parental rights in regard to another of her children.[1]

The mother identified Lyric's biological father as respondent, Robert Molenda, who was also incarcerated at the ACI at that time.[2] Molenda disputed the paternity of Lyric and the Family Court, on January 28, 2011, ordered that a paternity test be conducted. The results of the paternity test established that Molenda was indeed the father of Lyric.

DCYF filed a neglect petition for Lyric on December 23, 2010. Lyric was placed in the temporary custody of DCYF on January 20, 2011, pursuant to a December 30, 2010 Family Court order.

DCYF filed a petition on June 4, 2012 to terminate the parental rights of both Lyric's biological mother and respondent. In its petition, DCYF alleged the following grounds for terminating the parental rights of both parents: that they were unfit by reason of conduct seriously detrimental to the child in that they have chronic substance-abuse problems; and that the child had been placed in the legal custody of DCYF for at least twelve months with no substantial probability that the child would be able to return safely to the parents' custody within a reasonable period of time. The Family Court subsequently granted a motion by DCYF to amend the petition, which added the following ground for terminating the parental rights of respondent: that he was unfit by reason of conduct seriously detrimental to the child such as

---

[1] The mother's termination of parental rights with respect to that child was appealed to this Court, and we affirmed the decree of the Family Court terminating the mother's parental rights. See In re Amiah P., 54 A.3d 446 (R.I. 2012).

[2] On November 28, 2011, respondent was sentenced on one count of felony conspiracy to ten years, with three years to serve, and on one count of first-degree robbery to ten years, with three years to serve. On March 13, 2012, respondent was sentenced on one count of domestic assault to five years, with one year to serve, concurrent and retroactive to his other sentences. At the time of the hearing, he was scheduled to be released from the ACI on April 13, 2013.

mental illness, mental deficiency, or institutionalization of the parent for such a duration as to render it improbable for the parent to care for the child for an extended period of time.

A hearing on the termination of parental rights of both the mother and respondent was held before a justice of the Family Court on September 14 and 18, 2012, and October 19, 2012.[3] Jennifer Jawharjian, a DCYF caseworker, testified that she had been assigned to Lyric's case from his birth. Ms. Jawharjian explained that Lyric was born premature, had been addicted to substances at birth, and had difficulty breathing. She stated that he was on medication to help with withdrawal symptoms from addiction and that he has also received physical therapy. After being discharged from the hospital, Lyric first went to a specialized home for children with medical needs before going to a foster home.

Ms. Jawharjian further testified that the case plan she had developed for Molenda regarding Lyric required that he complete classes in domestic violence, anger management, parenting, and substance abuse. She explained that she identified those specific classes because Molenda was in the ACI on a charge of felony assault against the mother and because she was concerned that he might also have a history of substance abuse. Ms. Jawharjian said that, to her knowledge, respondent had not attended any of the required classes while at the ACI.

Ms. Jawharjian testified that she had given her contact information to respondent shortly after Lyric's birth but that, from the day Lyric was born through May of 2012, when her assignment to Lyric's case ended, she had never been contacted by respondent with any inquiries as to Lyric's welfare. She stated that Lyric's visits with respondent at the ACI began soon after paternity was established. She further elaborated that these visits with respondent were generally

---

[3] Lyric's mother's parental rights were terminated after she was defaulted for failing to appear at the trial. The mother filed an appeal to this Court but later withdrew the appeal. Accordingly, the termination of the mother's parental rights is not at issue before this Court.

biweekly unless some issue arose with regard to Lyric's health. She clarified that she supervised between six and ten visits and that a case aide supervised the other visits. She recalled that during the visits respondent generally showed affection for the baby.

Ms. Jawharjian also testified that, from her observations of Lyric in his foster home, "he is very well taken care of, nurtured by both [foster] parents, bonded to both parents as well as the other children in the home." She stated that respondent had objected to Lyric's placement in this foster home, desiring that Lyric be placed with his own mother, Lyric's paternal grandmother, instead. Ms. Jawharjian explained that respondent's mother had indicated that she could not take care of Lyric at that time.

Linda Brown, who took over Lyric's case from Ms. Jawharjian, testified next. She noted that visits to the ACI were "difficult for the child because it's * * * not a child-friendly environment[,]" but stated that respondent showed affection for the child during the two visits that she supervised. Ms. Brown explained that Lyric continued to receive special services, including physical and occupational therapy, because he had not reached the age-appropriate milestones in his development. She agreed with Ms. Jawharjian that Lyric appeared to be very comfortable in his foster home and that "[h]e seems attached to the foster mother."

The next person to testify was respondent's mother, Romualda Molenda. Ms. Molenda testified that she had met Lyric only once, in July 2011, but that she had asked to see Lyric on other occasions as well. On being asked if she had been contacted about possibly taking Lyric into her home, she responded that at the time she was afraid of Lyric's mother because Lyric's mother used to "beat [respondent] up." Ms. Molenda stated that, prior to his arrest, respondent had owned a house in Providence, but that it has since been "foreclosed" and that she bought the house at the foreclosure sale. She explained that she bought the house so "[t]hat [respondent]

and his son and his daughter[4] can have a home to live in." Ms. Molenda further testified that respondent had been self-supporting and employed in construction, painting, and truck driving.

The respondent testified next, disputing Ms. Jawharjian's testimony regarding substance abuse and attendance at classes. He submitted a letter he had written to his attorney in June of 2012, in which he wrote that he was following the case plan set up by DCYF and that he had begun mental-health counseling, drug and alcohol abuse classes, and parenting classes. The respondent also submitted certificates of completion for substance-abuse classes, a parenting class, and a health-education class, copies of which he asserted he had also sent to DCYF.

The respondent confirmed that, from 1990 up until his incarceration in 2010, he worked in construction and drove trucks during the winter months. Molenda asserted that he had offered to provide financial support for Lyric to Ms. Jawharjian but that she had refused it. He also stated that he had volunteered his daughter to help with Lyric's care as "the foster mother was [overwhelmed] * * * with three kids." He explained that he had deeded his house over to his mother in September 2011, before he was sentenced, "because [he] wasn't sure how much time [he was] going to get * * *."[5] He testified that he had been in contact with Lyric's foster parents through their relatives to inquire about Lyric's welfare. According to him, he had not contacted DCYF directly because "[it] was a very scattered organization" but that "[he] always knew what was happening with [his] son * * *." He said that he had asked his lawyer to ask Ms. Jawharjian for visitation whenever he was in court but that he had not contacted DCYF outside of those occasions because he believed he was not permitted to do so. The respondent also claimed that

---

[4] The respondent's daughter, who was nineteen years old and lived with Ms. Molenda at the time of the hearing, had been mostly raised by respondent up until his arrest.

[5] The respondent appeared to be somewhat confused as to whether he had actually deeded his house to his mother or if she had bought the house after the mortgage had been foreclosed. In any event, it is undisputed that respondent's house in Providence is currently owned by his mother.

he was not able to call DCYF from the ACI because making calls to an automated number was not permitted.[6] He estimated that in the twenty-two months of Lyric's life, he had approximately twelve visits with him lasting about an hour each, saying that he used to play with him and change his diaper and bottle-feed him. He also stated that DCYF had promised visits to make up for any that were missed and that the visits were supposed to be biweekly but that sometimes two months went by between them.

He asserted that, with good-time credits, he expected his release from the ACI to occur on January 1, 2013, and that afterwards he would live with his mother until he could ensure that his house in Providence was habitable again. He testified that his mother's house would be an appropriate home for Lyric as well, noting that Lyric had visited Ms. Molenda there once before. He also stated that he expected to be employed by a painting company upon his release from the ACI, and offered a letter from the company confirming that respondent would have an opportunity for employment upon release.

Molenda stated that he was aware that Lyric needed physical therapy and that his speech development was delayed. He confirmed that he was willing to learn how to provide the necessary care for Lyric and did not feel that there was any impediment to his ability to take care of Lyric. He also explained that he had spoken with both his mother and his daughter about helping him take care of Lyric while he was working.[7]

The last witness at the hearing was Lyric's foster mother, Mrs. Amanda Patenaude, who is also Lyric's aunt. She testified as to Lyric's special needs and his physical therapy, explaining

---

[6] The respondent also submitted two letters which he had written to his attorney in which he requested visitation with Lyric. He stated that he was not aware that he was supposed to contact DCYF directly with regard to visitation as opposed to going through his lawyer or his mother.

[7] The respondent testified that his daughter attends classes at CCRI and works at night as a manager at McDonald's.

that she also has a two-year-old child who is enrolled in many of the same programs as Lyric, allowing the two children to attend them together. She stated that Lyric had become an integral part of her family, having grown up his entire life with her two children. She confirmed that "[she has] nothing but a mother's love for him in every sense of the word." She testified that she would adopt Lyric "[i]n a heartbeat * * * [with] no hesitation," further adding that "[she] would be very, very, very devastated to ever see him go." She acknowledged having a telephone conversation with Ms. Jawharjian's supervisor, where she and her husband were asked if they would be willing to negotiate an open adoption and said that they would prefer not to. She admitted that she has never met respondent's mother, Ms. Molenda, but explained that she would generally not be comfortable involving people she does not know in Lyric's life.

In a bench decision at the conclusion of the hearing, the hearing justice found that DCYF had proven "beyond a reasonable doubt" that the child would not be able to return safely to his father's home within a reasonable period of time.[8] He further stated that "it's quite assuredly * * * in the child's best interest that the father's rights be terminated * * *." In his decision, he noted that Lyric had never lived with respondent and that respondent had initially questioned Lyric's paternity. He further took note of the fact that respondent had a history of violent behavior and domestic abuse. The hearing justice acknowledged the letter from the painting company but stated that "everybody knows * * * during these economic times[,] you just don't walk out and get a job. You have to look for the job." He also commented that the "[f]ather seems to me to be an expert on passing the burden on to someone else to take care of his responsibilities[,]" citing respondent's testimony about his trouble contacting DCYF except "when he wanted to." The

---

[8] The hearing justice's conclusion was prescient in that the child, at the time of oral argument, was still not able to return safely to his father's home, as respondent had been voluntarily deported to Poland.

hearing justice conceded "that the father may very well love this child," but stated that there is "no indication, no proof that this father ever loved the child." In any event, the hearing justice emphasized that "love isn't the sole answer to everything. Love doesn't pay for the special services that this child needs. Love doesn't put food into the child's mouth or pay for the child's clothing." He further cast doubt upon respondent's ability to provide the care that Lyric needs, explaining that respondent had "offered no practical explanation as to how he intended to do [so]." Finally, the hearing justice emphasized that Lyric had been in his foster home since he was a month old and had become an integral part of the family, citing Mrs. Amanda Patenaude's testimony. Accordingly, the hearing justice terminated respondent's parental rights.

A decree to that effect entered on November 16, 2012. The respondent filed a motion to enlarge the time to file a notice of appeal, which the Family Court granted on December 18, 2012. Thereafter, respondent filed a notice of appeal to this Court on December 19, 2012.

## II

### Standard of Review

"In reviewing appeals from [termination of parental rights] rulings, this Court examines the record 'to establish whether the hearing justice's findings are supported by legally competent evidence.'" In re David L., 877 A.2d 667, 671 (R.I. 2005) (quoting In re Shawn B., 864 A.2d 621, 623 (R.I. 2005)). The hearing justice's findings are "entitled to great weight, and this Court will not disturb them unless they 'are clearly wrong or the trial justice overlooked or misconceived material evidence.'" In re Amiah P., 54 A.3d 446, 451 (R.I. 2012) (quoting In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008)).

"Natural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011) (quoting

Santosky v. Kramer, 455 U.S. 745, 753 (1982)). The parent's right to due process must be satisfied before the parent's rights to the child are severed; the trial justice must therefore find that the state has satisfied its burden of proof with clear and convincing evidence that the parent is unfit. In re Amiah P., 54 A.3d at 451 (citing In re Pricillion R., 971 A.2d 599, 604 (R.I. 2009)); In re Jazlyn P., 31 A.3d at 1279; In re Victoria L., 950 A.2d at 1174. "After the trial justice finds that the parent is unfit, 'the best interests of the child outweigh all other considerations.'" In re Alexis L., 972 A.2d 159, 165 (R.I. 2009) (quoting In re Destiny D., 922 A.2d 168, 173 (R.I. 2007)).

### III

### Discussion

The respondent raises three arguments on appeal. First, respondent contends that DCYF had not shown that he was unfit by reason of imprisonment as he "anticipated [that he would] leave prison in a few months [of the hearing]." See G.L. 1956 § 15-7-7(a)(2)(i). Second, respondent argues that DCYF failed to satisfy its burden of proof that there was "not a substantial probability that the child [would] be able to return safely to the parents' care within a reasonable period of time consider[ing] the child's age and the need for a permanent home[.]" See § 15-7-7(a)(3). Third, respondent alleges that DCYF "failed to make reasonable efforts to rectify the situation that had caused Lyric to come into care by its failure to provide services." See § 15-7-7(b)(1).

The respondent concedes that Lyric had remained in the care of DCYF for at least twelve months, and does not contest the trial justice's findings regarding the "best interests of the child" on appeal.[9]

## A

### Lack of Substantial Probability of Child's Return

Termination of parental rights under § 15-7-7(a)(2)(i) requires a finding that a

> "parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, * * * (i) [i]nstitutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for an extended period of time[.]"

Termination of rights under § 15-7-7(a)(3) is allowed if the court finds that the child has been in the custody of DCYF for at least twelve months; that the parent has been offered services by DCYF to correct the situation; and that "there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time * * * [.]"  A termination of rights may be supported on either ground, that respondent was unfit or that the child was unlikely to be able to return to respondent's care within a reasonable period.

Here, after hearing testimony from respondent and Lyric's paternal grandmother, the trial justice examined Molenda's childcare support system.  The trial justice considered that respondent's plan to care for Lyric upon release was to live at his mother's house.[10]  He found

---

[9] General Laws 1956 § 15-7-7(c) requires that, even if the rest of the statute is satisfied, the best interests of the child must be considered before termination of parental rights.  The trial justice found that termination of the father's parental rights would be in Lyric's best interest.  The court stated that "this child is placed in relative care [sic] and this is a loving, nurturing and stable placement.  This is also a pre-adoptive home where the child has been residing the child's entire life—the only home the child has ever known."  We agree with the trial justice's determination that termination of respondent's rights is in the child's best interest.

[10] In evaluating this plan, the hearing justice may have considered the testimony of Lyric's paternal grandmother, in addition to respondent's testimony and other evidence.  Lyric's paternal

- 10 -

that respondent's mother "basically took over the care and control of his daughter [at the time of respondent's imprisonment] when she was 16 1/2 years of age" and that she had lived with Molenda's mother since then. The trial justice weighed respondent's plan, finding it questionable: "Who takes care of Lyric during this period of time? His mother, as she took care of the daughter since she was at least 16 1/2? Father seems to me to be an expert on passing the burden on to someone else to take care of his responsibilities."

Even when an incarcerated parent's efforts to change the direction of his or her life are commendable, it may remain highly unlikely or impossible for a child to return safely to that parent's care within a reasonable period of time. See In re Amiah P., 54 A.3d at 450-51. Moreover, "in considering the length of a parent's incarceration, 'the trial justice is not required to consider parole eligibility[;] he or she is only required to consider the probable duration of imprisonment at the time of the termination.'" Id. at 453 (quoting In re Alvia K., 909 A.2d 498, 503 (R.I. 2006)); see also In re Amber P., 877 A.2d 608, 615-16 (R.I. 2005) (holding that, while "the fact of incarceration alone is not sufficient to terminate parental rights," the trial justice may consider the total sentence in determining the probable duration of imprisonment, as opposed to the date of earliest parole eligibility) (quoting In re Faith H., 813 A.2d 55, 57 (R.I. 2003)).

Molenda's completion of classes at the ACI, consistent with the case plan, are praiseworthy and must be considered. However, these actions alone may not necessarily result in the child being able to return to respondent's care within a reasonable period of time. The trial justice considered respondent's testimony, "history of * * * domestic abuse[,]" and probable duration of imprisonment. The trial justice found that, even if respondent received parole at his earliest eligibility in January 2013, he would not be ready to take the child, as respondent "has

grandmother explained why she had only met Lyric once and had declined to take Lyric into her home upon DCYF's inquiry.

offered no practical explanation" as to how he would take care of the child. Accordingly, the trial justice concluded that the father was unfit by reason of imprisonment and that, even after the father's release, he would not be able to take care of Lyric. See § 15-7-7(a)(2)(i).

Furthermore, having concluded that it was unlikely that Lyric would be able to return to respondent's care and because it was undisputed that Lyric had been in the custody of DCYF for more than one year at the time of the hearing, the trial justice determined that the requirements of § 15-7-7(a)(3) had also been met. The trial justice "hears the testimony '[f]rom the vantage point of his front-row seat in the courtroom.'" In re Daniel D., 9 A.3d 651, 656 (R.I. 2010) (quoting In re Alexis L., 972 A.2d at 170). In the context of observing the testimony of respondent and other witnesses, the trial justice acted within his discretion in finding that respondent was unfit and that it was improbable that Lyric would be able to return to respondent's care within a reasonable period of time. We are satisfied that the evidence in the record supports the trial justice's findings. The trial justice did not clearly err in his conclusions; and, therefore, this Court defers to his judgment and will not disturb his decision on appeal.

## B

### Reasonable Efforts

In addition to proving that a ground for termination of parental rights exists because of parental unfitness or the lack of substantial probability that the child will be able to return to the parent's care, DCYF must demonstrate that it has satisfied the "reasonable efforts" requirement of § 15-7-7(b)(1).[11] To meet this standard, the department must show that it has satisfied certain

---

[11] Section 15-7-7(b)(1) provides in relevant part that

> "pursuant to [a termination for parental unfitness under] * * * (a)(2)(i) * * * the court shall find as a fact that * * * parental conduct or conditions [that are seriously detrimental to the child]

requirements, including "case planning with the parent, arrangements for visitation, and keeping the parent informed of the child's well-being." In re Alan W., 665 A.2d 877, 878 (R.I. 1995). "'Reasonable efforts' are determined on a case-by-case basis * * *." See In re Julian D., 18 A.3d 477, 484 (R.I. 2011). This Court has repeatedly stated that "it is primarily and ultimately the responsibility of the parent, not DCYF, 'to substantially and repeatedly maintain contact with [his or her child]' who is in the care of DCYF." In re Daniel D., 9 A.3d at 656 (quoting In re Serenity K., 891 A.2d 881, 884 (R.I. 2006)). Furthermore, the department has no duty under § 15-7-7 "to create a case plan for the father until it establishe[s] his paternity." In re Shaylon J., 782 A.2d 1140, 1143 (R.I. 2001).

DCYF had no obligation to respondent during the time period in which he denied paternity. See In re Jose Luis R.H., 968 A.2d 875, 883 (R.I. 2009); In re Shaylon J., 782 A.2d at 1143. Paternity was established in May 2011. In June 2011, when Lyric was approximately seven months old, biweekly visitation began and a case plan was formulated. Although respondent contended at oral argument that DCYF missed multiple visits, the department explained that the child's medical conditions prevented some of them. Missed visits of this nature do not reflect on whether the department made reasonable efforts. See In re Jose Luis R.H., 968 A.2d at 883-84. Moreover, even if the department is at fault for a relatively small

> must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition [to terminate parental rights] to encourage and strengthen the parental relationship so that the child can safely return to the family."

This Court has consistently held that the same showing of reasonable efforts detailed in § 15-7-7(b)(1) are implicitly required for termination under § 15-7-7(a)(3). See In re Steven D., 23 A.3d 1138, 1156n.12 (R.I. 2011); In re Julian D., 18 A.3d 477, 483 (R.I. 2011); In re Christopher B., 823 A.2d 301, 315 (R.I. 2003).

number of missed visits, DCYF's efforts are not necessarily rendered inadequate; the department's efforts should be examined in their totality. See id.

The "conduct and cooperation of the parent[]" provide context in assessing whether DCYF's efforts are reasonable. See In re Gabrielle D., 39 A.3d 655, 667 (R.I. 2012) (quoting In re Jose Luis R.H., 968 A.2d at 883); In re Natalya C., 946 A.2d 198, 203 (R.I. 2008). The respondent admitted that he had never called DCYF's assigned caseworker, Ms. Jawharjian, to inquire about the welfare of his child. He testified that he believed he should not speak to DCYF, since "[y]ou don't talk to the prosecutors." Moreover, he testified that he did not believe he could call DCYF through the phone at the ACI, despite Ms. Jawharjian's testimony that she gave respondent her business card and that DCYF accepted collect calls from the ACI. Instead, respondent contended that he had regular but indirect contact with the foster parents through a fellow inmate—the brother of both the foster father and Lyric's mother—and also through Lyric's paternal grandmother. The trial justice was well within his authority to weigh evidence regarding respondent's circuitous means of contact, and further, determine the reasonableness of DCYF's efforts in light of respondent's conduct and cooperation with the department. See In re Jose Luis R.H., 968 A.2d at 883.

We conclude that the trial justice had sufficient evidence to determine that DCYF's actions constituted reasonable efforts. The record details the services DCYF offered and those in which the respondent participated. Given the evidence of DCYF's actions, this Court cannot conclude that the trial justice clearly erred in finding that the department had met its burden to make reasonable efforts under § 15-7-7(b)(1).

## IV

## Conclusion

For the reasons explained in this opinion, we affirm the decree terminating the respondent's parental rights. The record shall be remanded to the Family Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       In re, Lyric P.

**CASE NO:**              No. 2013-11-Appeal.
                          (07-4022-3)

**COURT:**                Supreme Court

**DATE OPINION FILED:**   May 16, 2014

**JUSTICES:**             Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**           Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**     Providence County Family Court

**JUDGE FROM LOWER COURT**:

                          Associate Justice John A. Mutter

**ATTORNEYS ON APPEAL:**

              For DCYF:    Karen A. Clark,  Esq.
                           Department of Children, Youth, and Family

              For CASA:    Shella R. Katz, Esq.
                           Court Appointed Special Advocate

              For Respondent:
                           Susan B. Iannitelli, Esq.