**In re KAYLA N.**

**No. 2003–400–Appeal.**

Supreme Court of Rhode Island.

June 30, 2006.

Lia Stuhlsatz, Esq., Keene, New Hampshire, for Irving N.

Paula Rosin, Esq., Providence, for Dawn N.

Robert J. Caron, Esq., for Sandra N.

Karen A. Clark, Esq., Providence, for DCYF.

Frank P. Iacono, Jr., Esq., for CASA.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

### Introduction

Justice ROBINSON for the Court.

This is an appeal from a Family Court judgment terminating the parental rights of the respondents Dawn and Irving N. with respect to their child, Kayla N., and denying a petition for an open adoption of the child by the respondent Sandra N., who is the child's paternal aunt. For the reasons set forth herein, we affirm the judgment of the Family Court.

### Facts and Travel

The involvement of Dawn and Irving N. with the Department of Children, Youth and Families (DCYF) began even before the birth of their daughter, Kayla. Both parents are cognitively limited and have been diagnosed as being mildly mentally retarded. Prior to her marriage to Irving, Dawn had had another child, Michelle, with another man; but Dawn was unable to care for Michelle because, in addition to her cognitive and other limitations, she moved from place to place and was home-

less at one point.[1] After DCYF filed a petition for involuntary termination of parental rights with respect to Michelle, Dawn agreed to an open adoption of that child by the foster family with whom Michelle had been living.

Prior to Kayla's birth, DCYF had determined that it would be unsafe for the baby to be placed at home with Dawn and Irving due to (1) Dawn's inability to care for her first child; and (2) DCYF's concerns about threats to the child and to Irving that had been made by Dawn's mother. Approximately one month before Kayla's birth, DCYF had inquired as to whether there were any biological relatives with whom Kayla could be placed, and Irving had suggested both his niece, Cheryl L., and his sister, Sandra N. However, DCYF deemed Cheryl L. to be an unsuitable candidate because she herself had an open case with the agency at that time. The second suggested biological relative, Sandra N., was unable at that time to take on the full-time responsibility which placement of Kayla with her would entail, because she was caring for two other relatives, each of whom was terminally ill.

Consequently, after Kayla was born on April 13, 2000, she was placed in non-relative foster care with the foster parents (who later became the adoptive parents) of her half-sister, Michelle. Kayla has remained with that foster family ever since.

DCYF developed several case plans for Dawn and Irving, the goal of each of which was the reunification of Kayla with her parents. As part of those case plans, DCYF also provided certain services to the parents, including a referral to a parent-aide program conducted by an entity known as Spurwink of Rhode Island (Spurwink). That program is tailored to assist parents and/or children with cognitive limitations or developmental delays. As part of the services offered by Spurwink, which services began when Kayla was born, Dawn and Irving visited with Kayla once a week at a DCYF office, under the supervision of a Spurwink case aide.

In October of 2000, Dawn and Irving began to request that their visits with Kayla take place in their home. On December 1, 2000, both parents admitted to dependency due to their cognitive limitations. Their admissions of dependency were conditioned, however, upon DCYF's arranging supervised in-home visits between Kayla and them. The Family Court ordered that DCYF provide such visits by January 26, 2001. Spurwink refused to supervise the court-ordered in-home visits between Kayla and her parents, stating in the discharge summary that its refusal was prompted by "safety issues and concerns."[2] Because Spurwink was unwilling to supervise in-home visits, the last Spurwink-supervised visit took place at a DCYF office on December 29, 2000.[3]

Earlier in December, Spurwink had informed DCYF that funding for its services was running out, and it requested that DCYF renew the necessary funding so that it could continue to provide parent education services to Dawn and Irving. Spurwink reiterated its request for the renewal of funding twice more in January of 2001. However, DCYF opted not to renew funding for Spurwink's services on

1. Kayla is Irving's only child.

2. The "safety issues and concerns" mentioned in the Spurwink discharge summary, dated January 10, 2001, appear to revolve around a purported threat made by Dawn in a telephone message to a Spurwink employee, in connection with an ongoing conflict involving Dawn's mother.

3. Because no home visits had been arranged for Dawn and Irving, their admissions of dependency were vacated on January 26, 2001.

the ground that Spurwink had refused to supervise in-home visits. Because the funding was not renewed, Spurwink's parent education services terminated in January of 2001.

Following the cessation of Spurwink's services, DCYF referred Dawn and Irving to several other programs. In February of 2001, weekly parent-aide services were provided to Dawn and Irving by the John Hope Settlement House; those services included in-home visits for two hours once per week.[4] Funding for the services of the John Hope Settlement House unfortunately ran out in March of 2001, and DCYF did not renew that funding. Consequently, those services terminated on March 22, 2001. In March of 2001, DCYF made a referral to the Child Development Center at Rhode Island Hospital in order to obtain services to address the special needs of Dawn and Irving. The Child Development Center also later diagnosed Kayla as having global developmental delays.

In April of 2001, the Family Court ordered that Dawn and Irving be provided two unsupervised in-home visits per week with Kayla. In addition to arranging those visits, DCYF referred Dawn and Irving to the Early Intervention Program at the Meeting Street Center, and those services began in May of 2001. DCYF also referred Dawn and Irving to the Healthy Tomorrows Program of the Kent County VNA and to a parent-aide program of Children's Friend and Service, Inc., called Partners in Permanency. Dawn and Irving were also referred for various evaluations and for individual counseling. It is undisputed that Dawn and Irving substantially complied with each referral.

In August of 2001, Irving's sister, Sandra, began hosting overnight visits with Kayla at her home once a week; and Dawn and Irving visited Kayla during those overnight visits at Sandra's home.[5] Dawn and Irving were also counseled in their own home by a parent aide from the Partners in Permanency program, and Kayla was occasionally present at those meetings as well.

On January 4, 2002, Irving filed a motion seeking to have Kayla placed with his sister, Sandra. On January 10, 2002, DCYF filed a petition to terminate the parental rights of both Dawn and Irving alleging, in reliance upon G.L.1956 § 15–7–7(a)(2)(vii), that Dawn and Irving were unfit to parent Kayla on the ground that they "exhibited behavior or conduct that is seriously detrimental to the child, of such a duration as to render it improbable for the parents to care for the child for an extended period of time." DCYF's petition also alleged, in reliance upon § 15–7–7(a)(3), that Kayla had been in the legal custody or care of DCYF for a period of at least twelve months; that Dawn and Irving had been offered and had received services to correct the situation and that there was not a substantial probability that Kayla would be able to return to their care within a reasonable period of time considering her age and need for a permanent home.

4. In March of 2001, a supervisor at the John Hope Settlement House sent a favorable progress report to DCYF with respect to Dawn and Irving. On April 11, 2001, counsel for Irving filed a motion seeking reassignment of a DCYF caseworker, who Irving alleged had failed to disclose that report to the Court. The Family Court granted that motion on April 26, 2001.

5. By the end of November of 2001, Sandra's other niece and her brother, for both of whom she had been caring on a full-time basis, had died. Sandra then discussed with Irving the possibility of seeking placement of Kayla with her.

On February 21, 2002, Irving filed a motion seeking to have Kayla permanently placed with his sister, Sandra, in contemplation of a "direct consent adoption" of Kayla by Sandra. On February 24, 2002, Dawn filed a motion seeking the same placement for Kayla; her motion incorporated Irving's motion by reference. On April 5, 2002, Sandra filed a petition for adoption, to which Dawn and Irving consented, which was accompanied by an open adoption decree form. Initially, a justice of the Family Court ordered that the adoption petition be heard prior to any hearing on DCYF's petition for termination of parental rights, but he thereafter indicated that he would not give precedence to the hearing on the adoption petition. Dawn, Irving, and Sandra then filed a joint petition with this Court seeking issuance of a writ of certiorari. We granted that petition on May 23, 2002. In the order granting the petition for writ of certiorari, we ordered that "[t]he hearing on the direct consent adoption petition * * * be consolidated with the termination of parental rights hearing."

After the remand by this Court, the consolidated hearing in Family Court began on May 24, 2002. It was a protracted hearing, and it continued on various dates until December 6, 2002. The hearing justice ruled that the hearing on DCYF's petition for termination of parental rights would proceed first; and, immediately after conducting that hearing, he heard testimony with respect to the petition for a direct consent adoption that had been filed by Sandra and consented to by Dawn and Irving. At the conclusion of the consolidated hearing, the Family Court justice issued a forty-two-page decision, in which he reviewed in some detail the testimony of the witnesses (which testimony is recorded in fourteen volumes of transcript). He also expressed concern about the number of innocent parties involved in the case and about the emotionally heartbreaking aspects of the case.

The hearing justice ultimately found that DCYF had shown, by clear and convincing evidence, that Dawn and Irving were unfit to parent Kayla. He further found that there was no probability that Kayla could safely be returned to their care within any reasonable time. The hearing justice also concluded, after considering the totality of the evidence, that DCYF had made reasonable efforts to reunify Kayla with her parents. After finding that Dawn and Irving were unfit to parent Kayla, the hearing justice also found that terminating their parental rights was in Kayla's best interests.

In addition, the hearing justice denied the petition for adoption that had been filed by Sandra and consented to by Dawn and Irving. In so doing, he found that the adoption petition would never have been filed had DCYF not petitioned for the termination of Dawn and Irving's parental rights. He determined that Dawn and Irving consented to the adoption petition because they felt that it was their only chance to maintain contact with Kayla. In addition, the hearing justice placed considerable weight on (1) the fact that Kayla and her half-sister, Michelle, had been raised in the same home since Kayla's birth and (2) the fact that the two young girls had closely bonded with each other during that time.

Dawn filed a notice of appeal on February 20, 2003. Irving and Sandra each filed a notice of appeal on March 26, 2003.[6]

---

6. These notices of appeal were all filed prior to the actual entry of the judgment on April 28, 2003. However, this Court has routinely treated prematurely filed notices of appeal as if they were timely. *See, e.g., McBurney v. The GM Card*, 869 A.2d 586, 589 n. 3 (R.I.2005);

The appeal was docketed in this Court on July 18, 2003. Visitation between Kayla and her parents has continued during the pendency of this appeal.

On appeal, respondents contend that the hearing justice made numerous errors in his findings of fact which formed the basis for his decision to terminate Dawn and Irving's parental rights.[7] Specifically, respondents contend that the hearing justice erred in finding (1) that DCYF made reasonable efforts towards reunification; (2) that Dawn and Irving were unfit under § 15–7–7(a)(2)(vii) and § 15–7–7(a)(3);[8] and (3) that it was in Kayla's best interests to have the parental rights of Dawn and Irving terminated. The respondents have also adopted the argument articulated by the Rhode Island Disability Law Center, Inc., in a brief which it filed in its capacity as amicus curiae, to the effect that certain provisions of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 through 12134, apply to proceedings to terminate parental rights.

With respect to the hearing justice's denial of the petition for adoption, respondents contend that Dawn and Irving retained the right to consent to Kayla's adoption prior to a final termination of their parental rights and that, by choosing to address DCYF's petition for termination first, the Family Court "short-circuited" their fundamental right to consent to the adoption. In addition, respondents contend that the Family Court should have deferred to their expressed preference concerning who would be a suitable adoptive parent for Kayla. They also argue that the denial of the adoption petition was contrary to Kayla's best interests. Finally, respondents contend that Sandra is a fit and proper relative to adopt Kayla and that the amount of time that Kayla has spent with her foster family should not control the outcome of this case.

### Standard of Review

■■■■ This Court employs a deferential standard of review when reviewing a Fam-

---

*Dovenmuehle Mortgage, Inc. v. Antonelli,* 790 A.2d 1113, 1114 n. 1 (R.I.2002).

**7.** Irving and Sandra N. are not represented on this appeal by the same counsel as represents Dawn, and the brief filed in this Court on behalf of Irving and Sandra is different from Dawn's. Nevertheless, Irving and Sandra have adopted and incorporated the arguments made by Dawn in her brief, and Dawn has likewise adopted and incorporated the arguments of Irving and Sandra.

**8.** The provisions of G.L.1956 § 15–7–7 that are relevant to this appeal read as follows:

"**Termination of Parental Rights.**—(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

" * * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

" * * *

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home * * *."

ily Court decision to terminate a person's parental rights. *See, e.g., In re Shawn M.,* 898 A.2d 102, 106 (R.I.2006); *In re Mariah M.,* 899 A.2d 423, 427 (R.I.2006). We examine the record to establish whether the hearing justice's findings are supported by legally competent evidence. *E.g., In re Shawn M.,* 898 A.2d at 106; *In re Mariah M.,* 899 A.2d at 427. The hearing justice's findings are entitled to great weight, and this Court will not disturb them on appeal unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong. *In re Shawn M.,* 898 A.2d at 106.

## Analysis

### I

### Termination of Parental Rights

#### A

#### The Americans with Disabilities Act

■ The respondents have adopted as their own the argument of the amicus, the Rhode Island Disability Law Center, Inc., to the effect that certain provisions of the Americans with Disabilities Act (the ADA), 42 U.S.C. §§ 12131 through 12134, apply to proceedings to terminate parental rights. Relying upon Title II of the ADA, which prohibits any public entity from discriminating against qualified persons with disabilities in the provision or operation of public services, programs or activities, 42 U.S.C §§ 12131–12134, respondents contend that DCYF is required to abide by the ADA when that agency seeks to terminate the parental rights of natural parents. The hearing justice, in his written decision, concluded that the ADA was not applicable to cases such as this one.

After considering the issue in a *de novo* manner, we are in agreement with the conclusion of the hearing justice, which is consistent with the result reached in cases from several other jurisdictions that have held that a termination-of-parental-rights proceeding does not constitute the sort of service, program, or activity that would be governed by the dictates of the ADA.[9]

We agree with and apply to termination of parental rights proceedings in this state the following language from a Florida court with respect to that state's dependency proceedings: "[Such] proceedings are held for the benefit of the child, not the parent. Therefore, the ADA is inapplicable when used as a defense by the parent(s) in proceedings such as here under review." *M.C. v. Department of Children & Families,* 750 So.2d 705, 706 (Fla. Dist.Ct.App.2000); *see also In the Interest of A.P.,* 728 A.2d 375, 379 (Pa.Super.Ct.1999).

Accordingly, we reject respondents' ADA-based contention.

#### B

#### DCYF's Efforts Towards Reunification

■ The respondents also contend on appeal that the hearing justice erred in finding that DCYF made reasonable efforts towards reunification. The respondents are correct that, pursuant to § 15–7–7(b)(1), DCYF was required to make reasonable efforts to encourage and strengthen the parental relationship so that Kayla could safely return to the family. *See In re Christopher B.,* 823 A.2d 301, 308 (R.I.

---

**9.** *See, e.g., In re Anthony P.,* 84 Cal.App.4th 1112, 101 Cal.Rptr.2d 423, 425, 426 (Cal.Ct. App.2000) (holding that a proceeding to terminate parental rights is not a governmental service, program, or activity and therefore is not preempted by Title II of the ADA); *In re Antony B.,* 54 Conn.App. 463, 735 A.2d 893, 899 (1999) ("[T]he ADA neither provides a defense to nor creates special obligations in a termination proceeding."); *In the Interest of Torrance P.,* 187 Wis.2d 10, 522 N.W.2d 243, 246 (Wis.Ct.App.1994).

2003). Moreover, this Court has stated that "'consistent with a "totality of the circumstances" approach,' the efforts required from DCYF to satisfy the reasonable efforts standard 'vary with the differing capacities of the parents involved.'" *Id.* (quoting *In re William, Susan, and Joseph*, 448 A.2d 1250, 1256 (R.I.1982)).

Nevertheless, we agree with the hearing justice's observation that "[t]here must be a limit to the extension of reasonable efforts." In the instant case, DCYF prepared four case plans, all of which had as their goal the reunification of Kayla and her parents. DCYF initially made a referral to Spurwink, a facility that tailored its programs to cognitively impaired persons; and, when those services were terminated, DCYF made no fewer than four other referrals to programs providing services intended to encourage and strengthen the parental relationship. In addition, the hearing justice pointed out that one of the parent aides to whom DCYF referred Dawn and Irving had had experience with persons suffering from the same medical condition as respondents.

We are unable to conclude that those various efforts aimed at reunification were inadequate. Accordingly, we affirm the hearing justice's determination that the efforts made by DCYF were not unreasonable.

## C

### The Hearing Justice's Finding of Unfitness

■ The respondents' next contention on appeal is that the hearing justice erred in finding that, pursuant to the provisions of both § 15–7–7(a)(2)(vii) and § 15–7–7(a)(3), Dawn and Irving are unfit to parent Kayla. They argue that none of the factual findings upon which the hearing justice based his conclusion that Dawn and

Irving are unfit constitutes clear and convincing evidence of conduct that would be "seriously detrimental" to Kayla. The respondents further contend that, even if the factual findings relied on by the hearing justice are viewed as a whole, DCYF's burden of proving unfitness by clear and convincing evidence still has not been met.

In his decision, the hearing justice acknowledged that at least one DCYF witness testified that Dawn and Irving were compliant with the parent aide to whom they had been referred. At the same time, however, the hearing justice pointed to the testimony of several other witnesses who testified that Dawn and Irving would probably not progress to the point where they could safely parent Kayla.

For example, the hearing justice pointed to the testimony of Lisa Granda, a representative from the Partners in Permanency program who met with Dawn and Irving on a weekly basis and who testified that, although the two parents "tried and were consistent in their meetings with her, * * * they just could not understand their responsibilities." In what the hearing justice considered to be significant testimony, Ms. Granda stated that the parents had made minimal progress and had been unable to demonstrate that they could "safely and effectively parent Kayla without continued supervision and ongoing interventions and directions." The hearing justice also pointed to Ms. Granda's observation that respondents seemed unable to develop the skills necessary to avoid conflict.

The hearing justice also referred in his decision to the report of Dr. Steven Hirsch, a clinical psychologist who had evaluated Dawn and Irving. With respect to Dawn, Dr. Hirsch's report stated: "Her psychological makeup indicates that she would have difficulty emotionally bonding to a young child. She has a tendency to put her own needs first." With respect to

Irving, Dr. Hirsch's report stated: "His emotional and cognitive functioning indicates that he has difficulty adequately caring for himself, let alone the special needs of a developmentally delayed eighteen month old child." Doctor Hirsch indicated that future psychological social services were not recommended for Dawn and Irving and that their parental rights should be terminated.

The hearing justice also pointed to the report of The Providence Center, the organization to which Dawn and Irving had been referred by DCYF for an assessment relative to the possibility of reunification. That report stated: "In conjunction with parents' observed tendency to misread Kayla's cues are their own unique ways of dealing with the stressors that a toddler presents. * * * These responses to Kayla's cues could and did result in Kayla's needs not being met." After reviewing the report, the hearing justice made two observations: (1) that Dawn and Irving loved Kayla and she loved them; and (2) that, unfortunately, the parents could not properly parent Kayla.[10]

Finally, the hearing justice referred to the testimony of various witnesses concerning specific instances in which Dawn and Irving had interacted with Kayla. These instances generally involved the parents' difficulty in controlling Kayla's behavior. The hearing justice also cited Dawn's reaction to her daughter's misbehavior, which often involved Dawn's leaving the house angrily. There was also testimony that Dawn often had to be told to get off the phone during times when she was supposed to have been visiting with Kayla. The hearing justice also noted that, although Dawn and Irving had learned how to use a nebulizer, which Kay-

la often needed for difficulty breathing, they did not understand when the nebulizer was to be used.

We are well aware of the gravity of a judicial decision that results in the termination of parental rights. We are in full agreement with the Supreme Court of Virginia when it stated: "The termination of parental rights is a grave, drastic, and irreversible action." *Lowe v. Department of Public Welfare of Richmond,* 231 Va. 277, 343 S.E.2d 70, 72 (1986). Nevertheless, there are times when such an action must be taken.

Although in the instant case it is clear that Dawn and Irving love Kayla and have largely complied with the various recommendations of DCYF, in the end we can perceive no clear error in the factual findings of the Family Court justice, nor do we disagree with his conclusion, which he reached after exhaustive review of the testimony of several witnesses, that reunification could never have been achieved. Consequently, we affirm the hearing justice's determination that Dawn and Irving were unfit to parent Kayla.

**D**

**Kayla's Best Interests**

■ The respondents contend on appeal that, even if this Court should uphold (as indeed we do) the hearing justice's determination that Dawn and Irving are unfit, he nevertheless erred in finding that the termination of their parental rights was in Kayla's best interests. We disagree with this contention.

In arguing that terminating the parental rights of Dawn and Irving is contrary to Kayla's best interests, respondents have

---

10. These observations of the trial justice poignantly summarize the inherently tragic nature of this case. The truth is that John

Lennon was not entirely correct when he famously declared: "Love is all you need."

brought to our attention the following passage from an article in the Harvard Law Review:

> "No child should be endangered by the foolhardy suggestion that he can thrive solely on the love of a parent, but neither should that parent's love be diminished by an insensitive, mechanistic process that singlemindedly extols the virtues of rationality." Robert L. Hayman, Jr., *Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent*, 103 Harv. L.Rev. 1201, 1257 (1990).

No one would contend that there is any shortage of love for this child emanating from any of the persons involved in this heart-wrenching case. If Kayla could thrive solely on her parents' love, the hearing justice's analysis of her best interests may have been different. It is our view, however, that, far from undervaluing the parents' love in the instant case by resorting to an "insensitive, mechanistic process," the hearing justice, who aptly described the case as one involving "a situation which is fraught with heartbreaking emotions," painstakingly articulated his findings in a very comprehensive decision and reached a conclusion that we consider to be sustainable.

We perceive no clear error in the hearing justice's "best interests" determination. In particular, it is our view that he properly saw much significance in the fact that Kayla has bonded with her half-sister and with her foster family, with whom she has lived since her birth more than six years ago. While not giving exclusive weight to that factor, the hearing justice appropriately considered the preservation of that bond in determining where the best interests of the child lie in this case.

After carefully considering the record, we affirm the hearing justice's determination with respect to Kayla's best interests.

## II

### Petition for Open Adoption

With respect to the hearing justice's denial of the petition for adoption, respondents contend that Dawn and Irving retained the right to consent to Kayla's adoption prior to a final termination of their parental rights and that, by going forward with DCYF's petition for termination, the Family Court "short-circuited" their fundamental right to consent to the adoption. In addition, they contend that the Family Court should have deferred to their preference as to who would be a suitable adoptive parent for Kayla and that the denial of the adoption petition was contrary to Kayla's best interests. Finally, respondents contend that Sandra is a fit and proper relative to adopt Kayla and that the amount of time that Kayla has spent with her foster family should not control the outcome of this case.

■ Contrary to respondents' contentions on appeal, it is our view that the hearing justice properly rejected the joint petition for an open adoption in the instant case. Open adoptions are creatures of statute, and the relevant statute, § 15–7–14.1(b)(4), expressly requires that, before the Family Court may in its discretion approve a proposed open adoption, DCYF or another licensed child placement agency and the child's guardian ad litem or court-appointed special advocate must first recommend to the court that the open adoption agreement be approved.[11] In the in-

---

11. Section 15–7–14.1(b) reads, in pertinent part, as follows:

"A court may grant post-adoption privileges if:

stant case, it is clear that DCYF did not recommend that the Family Court approve the petition for adoption and the accompanying decree of open adoption filed by Sandra and consented to by Dawn and Irving. Absent such a recommendation by DCYF, the Family Court was statutorily barred from considering the petition for open adoption. This would have been true even if the Family Court had not already terminated Dawn and Irving's parental rights prior to making its determination on the adoption petition.[12]

██ Moreover, the hearing justice determined that it would not be in Kayla's best interests to have her move from the home of her foster parents, where she has lived for her entire life with her half-sister, to the home of her aunt, Sandra. He found that Kayla and her half-sister are closely bonded and that to move her would "rupture the close relations" between the two. In concluding that the open adoption was not in Kayla's best interests, the hearing justice also noted that Kayla had bonded closely with her foster parents. Section 15–7–14.1(b)(1) requires a court to first determine that the best interests of the child would be served before it may grant post-adoption privileges. In the instant case, the hearing justice found the converse to be true—*i.e.*, that Kayla's best interests would best be served by her remaining with the foster parents. We cannot say that he clearly erred in so finding.

> "(1) The court determines that the best interests of the child would be served by granting post-adoption privileges; [and]
> " * * *
> "(4) The department of children, youth and families and the child's court appointed special advocate or the guardian ad litem, if one has been appointed * * *, recommends that the post-adoption privileges agreement be approved by the court; or if the adoption petition is being sponsored by a licensed child placing agency other than the department of children, youth, and families,

Consequently, we ·affirm the hearing justice's denial of the adoption petition.

### Conclusion

For the reasons set forth herein, we affirm the Family Court's judgment. The record may be remanded to the Family Court.

the licensed placing agency sponsoring the adoption makes a recommendation that the post-adoption privileges agreement be approved by the court."

12. Because we conclude that the Family Court lacked the statutory authority to consider the open adoption agreement, we do not address the serious issues raised by respondents concerning the "fundamental interest" of parents in determining who should be permitted to adopt their child before the termination of their parental rights.