June 15, 2022

**Supreme Court**

No. 2021-2-Appeal.
(P 17-2555)

In re Nolan V-S.                    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Nolan V-S.                    :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Long, for the Court.**  The Department of Children, Youth, and Families appeals from two Family Court decrees denying DCYF's petition to terminate the parental rights of the respondents, Brittaney[1] V. and Elias S., mother and father, respectively, to Nolan (collectively respondents).[2]  This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this appeal may be decided without

---

[1] While there were some inconsistencies in the record as to the spelling of the respondent mother's first name, our review of the record reliably indicates that this is the correct spelling, and therefore this is the spelling we use in this opinion.

[2] For the sake of privacy, we refer to members of the family at the heart of this appeal by their first names only.  We intend no disrespect.

further briefing or argument.  For the reasons set forth in this opinion, we vacate the decrees of the Family Court and remand the record to the Family Court with direction to the Chief Judge to make findings relative to the child's best interests within a period not to exceed sixty days.

## Procedural History

In December 2015, DCYF filed a neglect petition against respondents and placed Nolan in kinship foster care.[3]  Nolan was just fourteen months old at that time, and he has remained in foster care continually throughout the pendency of this case, more than six and a half years.

On July 20, 2017, nineteen months after he was placed in the care and custody of DCYF, DCYF filed the present petition in the Family Court to terminate respondents' parental rights pursuant to G.L. 1956 § 15-7-7(a)(3).  The petition alleged that Nolan had been in the legal custody or care of DCYF for at least twelve months, DCYF had offered services to correct the situation that led to the child being placed, and there was not a substantial probability that Nolan would be returned safely to respondents' care within a reasonable period of time considering the child's age and need for a permanent home.

---

[3] We have taken judicial notice of the related 2015 case involving the dependency and neglect petition filed in the Family Court with respect to Nolan and respondents.

A trial on the petition took place on nonconsecutive dates spanning a period of more than two years, from June 2018 through August 2020. In October 2020, the trial justice issued a lengthy written decision in which he summarized the testimony of eleven trial witnesses; however, his summary did not include the testimony of respondents. The trial justice's decision did not provide clear findings of fact; citing to *In re Kathaleen*, 460 A.2d 12 (R.I. 1983), the trial justice's decision stated, "[i]t is through repeated efforts to inform a parent of the need to engage in caseplanning and services, that the Department evidences reasonable efforts." The trial justice denied DCYF's petition to terminate respondents' parental rights in two written decrees—one pertaining to each parent—and DCYF filed a timely appeal.

After a prebriefing conference before this Court pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure, this Court issued an order directing the trial justice to make findings of fact in accordance with § 15-7-7(a)(3), and we remanded the case for a period not to exceed sixty days.

On March 9, 2022, the trial justice issued findings of fact consistent with Rule 52 of the Family Court Rules of Domestic Relations Procedure. He concluded "[t]hat DCYF has a duty to actively help parents to rehabilitate; through its action or inaction the State cannot so align itself against parents so as to render efforts to reunify a child insufficient to satisfy its statutory burden." Upon return of the record to this Court, the matter was scheduled for oral argument.

## Facts

What follows is a summary of the facts relevant to this appeal, as found by the trial justice by clear and convincing evidence in his March 9, 2022 findings of fact. Additional facts are included in the discussion of the issues.

Odina Slavin, the first of two DCYF caseworkers to work with respondents, first met with respondents in December 2015 to discuss case planning. The respondents initially refused to engage with Ms. Slavin, and they refused to sign any releases—a prerequisite for DCYF to provide services and to be able to communicate with service providers to obtain progress updates or set up additional services. The respondents also refused to discuss what services might be necessary for them to achieve reunification with Nolan. Ms. Slavin ultimately developed two case plans for Brittaney and Elias, one dated May 14, 2016, and the second dated December 13, 2016. The case plans each identified four progress areas: (1) substance abuse; (2) mental health; (3) stable employment; and (4) visitation.

Prior to the development of the first case plan, on January 29, 2016, the Family Court had ordered respondents to provide weekly, random, supervised drug and alcohol screens (screens); the Family Court family services unit would administer the screens until respondents identified a provider of their choosing. The Family Court thereafter issued additional orders that required respondents to provide screens; the subsequent orders stated that any missed screens would be considered

- 4 -

noncompliant. Nevertheless, on multiple occasions, both respondents failed to appear for their required screens. The Family Court family services unit sent three separate letters to Elias informing him that he had failed to appear for three consecutive dates, and sent one such letter to Brittaney.

On May 14, 2016, Ms. Slavin discussed respondents' first case plan with them. The respondents did not sign the case plan; they asked Ms. Slavin to send the case plan to their attorney. Ms. Slavin nevertheless provided copies to respondents, then sent the case plan to their attorney. Ms. Slavin reached out to respondents' attorney after not hearing from him. He stated that he would speak to respondents and return the plan, but Ms. Slavin never received a signed case plan.

Ms. Slavin also sent required releases to respondents' attorney. In response, the only signed releases Ms. Slavin received at that time were for a substance recovery center, Discovery House.[4] Because neither respondents nor their attorney had returned all necessary releases, as of May 2016 DCYF could not refer respondents for services. On May 17, 2016, the Family Court ordered respondents to execute releases for DCYF.

---

[4] The record of the case transmitted on appeal reveals that respondents, at some point prior to their involvement with DCYF, had engaged in opioid agonist treatment at Discovery House, a substance-abuse treatment center. However, once DCYF became involved, the parties identified a different substance-abuse treatment center, CODAC, to provide the required supervised screens.

That same month, respondents self-referred to Francis Sparadeo, Ph.D., to undergo psychological and parenting evaluations, which were completed in August 2016.[5] Despite contacting Dr. Sparadeo in October 2016 to obtain the results, DCYF did not receive the results of the evaluations until January 2017. Significantly, the results of the evaluations were flawed due to respondents' failure to return the relevant releases prior to the conducting of the evaluations. Without signed releases, DCYF could not provide Dr. Sparadeo the information in its possession; his work product was based entirely on respondents' self-reporting. The evaluations therefore lacked a credible basis.

At the end of 2016, Ms. Slavin finalized the second case plan, dated December 13, 2016. She sent it to respondents' attorney; once again, Ms. Slavin never received a signed case plan back.

---

[5] The trial justice's finding that the parents "self-referred" to Dr. Sparadeo is noteworthy. The parents chose Dr. Sparadeo to be their provider for psychological and parenting evaluations; Elias testified at trial that he did not want to use DCYF's providers. Ms. Slavin testified that she was not initially aware that the parents had completed the evaluation with Dr. Sparadeo.

At trial, it was revealed that Dr. Sparadeo had relied upon other professionals in his office to conduct Brittaney's psychological evaluation and respondents' parent-child evaluations. He did not conduct the evaluations, instead relying on the reports and notes of the other professionals, which were destroyed. There was no indication of these facts in the evaluation that Dr. Sparadeo ultimately sent to DCYF: Dr. Sparadeo was the only signatory.

Following a permanency hearing in February 2017, a Family Court decree resolving the related neglect petition entered on April 13, 2017. That decree, among other things, (1) amended the neglect petition to include an allegation of dependency; (2) entered an admission by respondents as to the dependency allegation; (3) entered a finding that Nolan was dependent as to respondents and committed to the care, custody, and control of DCYF; (4) ordered that the case plan be made an order of the court; (5) ordered respondents to comply with substance-abuse treatment at CODAC, including counseling sessions and two random screens per week; (6) set forth a graduated schedule for increased visitation between respondents and Nolan; (7) ordered respondents to execute releases for all services; and (8) ordered respondents to comply with weekly screens at the Family Court until they could receive screens through formal substance-abuse treatment.

In March 2017, having already sent the second case plan to respondents' attorney at the end of 2016, Ms. Slavin attempted to discuss the second case plan directly with respondents, who once again asked her to send it to their attorney. Additionally, throughout March 2017, neither respondent executed releases that would have allowed Ms. Slavin to make referrals for services. Ultimately, respondents signed the appropriate releases for treatment with CODAC, a new treatment provider, in May 2017, following the entry of the April 13, 2017 decree.

However, on July 12, 2017, Brittaney revoked her release with CODAC, thereby preventing CODAC from disclosing Brittaney's treatment status to DCYF. Elias subsequently revoked his release with CODAC in November 2017, and he did not sign a new release for CODAC until ten months later, in September 2018. Although Brittaney and Elias continued their treatment at CODAC, the revocation of their releases prevented DCYF from (1) obtaining information on their treatment progress and (2) providing funding for any screens beyond what CODAC would provide.

In December 2017, Brittany earned "monthly good standing" at CODAC, which reduced the frequency of her random screens to once per month. However, the lack of release on file resulted in CODAC being unable to receive payment from DCYF for the twice-weekly screens required by the Family Court decree; CODAC therefore did not screen Brittaney twice-weekly. Then, from January through February 2018, Brittaney completed an intensified treatment program at CODAC due to the status of her screens.[6] After completion of that program, CODAC once again required—but was unable to obtain—DCYF funding for the court-ordered twice-weekly screens for Brittany due to the lack of release. Subsequently, on

---

[6] We acknowledge that the trial justice did not admit the parents' screen results as evidence at trial. The record indicates, however, that CODAC placed patients on intensified treatment plans when their screens indicated the patient had returned to use.

- 8 -

March 16, 2018, CODAC placed Brittaney on "30 day breathalyzers" after she appeared at the facility trembling and smelling of alcohol.

During Elias's treatment at CODAC, he was placed on an intensified treatment plan "for a substantial period of time between November 2017 and April 2018 * * * due to questions about his screens[.]" Meanwhile, in December 2017 Elias was hospitalized and diagnosed with alcohol-related liver disease. The treating physician later testified before the Family Court that Elias reported drinking three to four times per week, and that Brittaney had informed the physician that Elias would drink five to ten drinks at a time.

Since the beginning of the case, respondents cooperated with all matters pertaining to visitation with Nolan. In November 2016, the parents executed the necessary releases to facilitate visitation with Nolan through Family Services of Rhode Island, a visitation program. They consistently showed up to scheduled visitations and had positive interactions with the child. The trial justice also found that respondents were wrongfully excluded from certain parental decisions involving Nolan. First, the trial justice found that DCYF had not been the first to inform respondents about an eye surgery Nolan was to undergo; rather, respondents learned about the surgery from Nolan's foster mother. Second, the trial justice found that respondents were not given the opportunity to engage in educational decisions and were excluded from the decision to enroll Nolan in Catholic school.

After finding the previously cited facts by clear and convincing evidence, the trial justice concluded in his March 2022 findings of fact on remand that DCYF had failed to prove that it had made reasonable efforts to reunify respondents with Nolan. The trial justice therefore declined to reach any further issues relating to the petition to terminate parental rights.

**Denial of Petition to Terminate Parental Rights**

On appeal from a decree resolving a petition to terminate parental rights, this Court examines "the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Gelvin B.*, 251 A.3d 503, 508-09 (R.I. 2021) (quoting *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019)). The trial justice's "findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Violet G.*, 212 A.3d at 166). "Before terminating a parent's rights to his or her child, the Family Court justice must find that the parent is unfit." *Id.* at 509 (quoting *In re Violet G.*, 212 A.3d at 166). In certain cases, the Family Court justice must also evaluate whether DCYF made "reasonable effort to correct the situation that led to the child's removal from the parent's care." *Id.* at 510 (quoting *In re Violet G.*, 212 A.3d at 167). "However, once the Family Court justice determines parental unfitness, the best interests of the child outweigh all other considerations." *Id.* at 509 (quoting *In re Violet G.*, 212 A.3d at 166).

On appeal, DCYF maintains that the trial justice erred in finding that DCYF failed to make reasonable efforts to reunify respondents with Nolan; DCYF asks that this Court remand the matter with instructions to the Family Court to enter an order terminating respondents' parental rights. We therefore consider whether the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong in concluding that DCYF failed to make reasonable efforts to reunify Nolan and his parents. *See In re Gelvin B.*, 251 A.3d at 509. We also consider whether the trial justice overlooked material evidence of parental unfitness. *See id.*

### Reasonable Efforts

Section 15-7-7(a)(3) provides that the Family Court shall grant a petition to terminate parental rights when DCYF shows by clear and convincing evidence that the child has been in the legal custody of DCYF for a period of at least twelve months; the parents were offered or received services to correct the situation that led to the child being placed; and there is not a substantial probability that the child will be able to return to the parents' care within a reasonable period of time.

At issue here is the requirement that, when DCYF files a termination petition pursuant to § 15-7-7(a)(3), it must prove by clear and convincing evidence that, prior to filing the petition, it undertook "reasonable efforts to encourage and strengthen the parental relationship so that the child may safely return to the family." *In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I. 2009). "The criterion of 'reasonable efforts' is

- 11 -

'subject to a case-by-case analysis'" that looks at the "totality of the circumstances[.]" *In re Gabrielle D.*, 39 A.3d 655, 666 (R.I. 2012) (first quoting *In re Nicole B.*, 703 A.2d 612, 618 (R.I. 1997), then quoting *In re Kayla N.*, 900 A.2d 1202, 1209 (R.I. 2006)). At base, DCYF must show that it made reasonable efforts to "address or correct the situation that led to the child or children's placement[.]" *In re Jose Luis R.H.*, 968 A.2d at 882 (quoting *In re Christopher B.*, 823 A.2d 301, 315 (R.I. 2003)). The DCYF efforts "may be substantiated by attempts to provide the family with services, case plans, visitation, and furnishing the parent with information of the child's well being." *In re John W.*, 682 A.2d 930, 932 (R.I. 1996).

We have said that, in a case where a parent requires services to ameliorate a particular difficulty afflicting the parent, DCYF must show that it at minimum offered services that were "'reasonable' in the sense of being capable of remedying the particular problem(s) that caused the children to be removed." *In re Steven D.*, 23 A.3d 1138, 1156 (R.I. 2011) (quoting *In re Natalya C.*, 946 A.2d 198, 203 (R.I. 2008)).

In determining whether DCYF made reasonable efforts, the trial justice must consider "the conduct and cooperation of the parents" as well as "the differing capacities of the parents involved." *In re Gabrielle D.*, 39 A.3d at 666 (first quoting *In re Nicole B.*, 703 A.2d at 618, then quoting *In re Kayla N.*, 900 A.2d at 1209). "DCYF need not undertake extraordinary efforts to reunite parent and child[.]" *In re*

*Jose Luis R.H.*, 968 A.2d at 882 (quoting *In re Diamond Y.*, 915 A.2d 1283, 1288 (R.I. 2007)). Importantly, DCYF is not "burdened 'with the additional responsibility of holding the hand of a recalcitrant parent.'" *In re Natasha M.*, 800 A.2d 430, 431 (R.I. 2002) (mem.) (quoting *In re Kristen B.*, 558 A.2d 200, 204 (R.I. 1989)).

The respondents contend before this Court that the trial justice correctly determined that DCYF failed to make reasonable efforts and instead had "stood back, taking minimal action to prevent the parents from falling." We disagree.

After thoroughly examining the record in this case, we conclude that the trial justice's findings by clear and convincing evidence—recited previously—establish that DCYF made significant attempts to reunify respondents with Nolan through offering case planning, services, and visitation, prior to the filing of the petition to terminate their parental rights. *See In re John W.*, 682 A.2d at 932 ("Reasonable efforts * * * may be substantiated by attempts to provide the family with services, case plans, visitation, and furnishing the parent with information of the child's well being."). Ms. Slavin first attempted to formulate a case plan with respondents in December 2015, shortly after Nolan was removed from their custody and placed in kinship foster care. However, as the trial justice summarized in his October 2020 decision on the petition to terminate, from "the very beginning, [respondents] have said 'no' to the Department's involvement[.]"

After Ms. Slavin's initial efforts in late 2015, respondents' cooperation with DCYF's reunification efforts improved only minimally. As the trial justice found, throughout 2016 respondents continued to ignore or rebuff Ms. Slavin's attempts to share and discuss case plans with them, and they refused to execute releases to receive the services required to progress in those case plans. Ms. Slavin also provided both case plans and releases to respondents' attorney in an attempt to obtain signatures through their attorney, and, despite the attorney's assurances that he would return the case plans to her, she did not receive them back.

The respondents did complete psychological and parent evaluations with Dr. Sparadeo. However, as the trial justice found, those evaluations were not reliable, and lacked a credible basis. The trial justice's findings support the conclusion that the inadequacy of the evaluations was solely attributable to respondents' failure to execute the releases that would have enabled DCYF to provide information relating to respondents' substance abuse.

By April 13, 2017, when the Family Court decree entered in the related neglect and dependency case, Nolan had been in the care and custody of DCYF for fifteen months. DCYF nevertheless had continued until that time to make efforts to reunify respondents with Nolan. In March 2017, Ms. Slavin again attempted to meet with respondents to discuss the second case plan, though Ms. Slavin had already sent that case plan to respondents' attorney; respondents did not engage. Further, despite

the May 17, 2016 and April 13, 2017 court orders to execute releases for services, respondents continued to refuse to do so. They ultimately did not execute the CODAC releases and start substance-abuse counseling until May 2017, *seventeen months after Nolan was taken into DCYF's care and custody*.

Furthermore, evidence from the record—overlooked by the trial justice—supports the conclusion that DCYF made reasonable efforts and that respondents refused to cooperate with DCYF. Elias testified before the Family Court that he had met with Ms. Slavin when DCYF first took Nolan into care, and that they discussed the services he would need to engage in to reunify with his son. He also testified that Ms. Slavin offered to make referrals for those services, and he acknowledged that he rejected the referrals because he did not trust DCYF.

It is undisputed that Nolan was taken into the care and custody of DCYF in late 2015 because of concerns that respondents were unable to care for Nolan due to their drug and alcohol use. Accordingly, the trial justice's findings establish that Ms. Slavin "offered" services designed to "address or correct the situation that led to the child or children's placement[,]" *In re Jose Luis R.H.*, 968 A.2d at 882, which respondents refused. *Cf. In re Isabella C.*, 852 A.2d 550, 559 (R.I. 2004) (reasoning that reasonable efforts were shown where a major impediment to the provision of timely reunification services was parent's refusal to sign releases for nearly six months after the child was removed from the parent's care). Moreover, they

persisted in their refusals despite multiple court orders requiring them to execute the releases.

Notwithstanding these findings and the evidence in the record, the trial justice faulted Ms. Slavin and DCYF for what he deemed to be their failure (1) to follow up with respondents or their attorney regarding the case plans and the releases, and (2) to file motions with the Family Court to compel compliance with court orders regarding releases and cooperation with the court-ordered screens. The trial justice concluded that

> "[t]here has been an abundance of evidence presented about the parents and their engagement or lack of engagement in repeated and continuous efforts to secure the return of their child, but evidence of workers['] reasonable efforts is scant. The evidence shows that two parents with substance-abuse addictions have been allowed to control and manipulate their * * * case from the very start, while the Department has stood back, taking minimal action to prevent the parents from falling."

Our examination of the record transmitted to this Court on appeal reveals that the trial justice's decision ignored clear precedent that "[t]he criterion of 'reasonable efforts' is 'subject to a case-by-case analysis'" that looks at the "totality of the circumstances[.]" *In re Gabrielle D.*, 39 A.3d at 666 (first quoting *In re Nicole B.*, 703 A.2d at 618, then quoting *In re Kayla N.*, 900 A.2d at 1209). The trial justice must consider, as part of the totality of the circumstances, "the conduct and cooperation of the parents." *Id.* (quoting *In re Nicole B.*, 703 A.2d at 618). Here, the

- 16 -

trial justice did not undertake a mandatory analysis of his findings pertaining to respondents' lack of cooperation for over twelve months while their child remained in foster care. It is therefore our conclusion that the trial justice erroneously absolved respondents of any responsibility to engage in the requirements for reunification; instead, the trial justice erroneously required that DCYF engage in "extraordinary efforts" to reunify respondents with Nolan. *See In re Jose Luis R.H.*, 968 A.2d at 882 (quoting *In re Diamond Y.*, 915 A.2d at 1288).

Moreover, it is well-established that "we do not fault the agency when * * * a parent's recalcitrance to treatment precludes reunification." *In re Gabrielle D.*, 39 A.3d at 666 (quoting *In re Natalya C.*, 946 A.2d at 203). Again, DCYF is not required to "hold[] the hand of a recalcitrant parent." *In re Natasha M.*, 800 A.2d at 431 (quoting *In re Kristen B.*, 558 A.2d at 204). The trial justice's determination that DCYF was required to file motions to compel respondents to engage in case planning—and to fulfill court-ordered aspects of those case plans—contravened this Court's clear precedent and was clearly erroneous. Throughout the pendency of this case, respondents bore some responsibility to make "a demonstrated showing of * * * effort[.]" *In re Elana W.*, 249 A.3d 287, 294 (R.I. 2021).

The trial justice further faulted DCYF for its failure to inform respondents at appropriate intervals of the child's progress and health. We share the trial justice's concerns about the evidence in the record demonstrating that DCYF may not have

- 17 -

provided timely updates to respondents regarding Nolan's health and education. We share the trial justice's particular concern that DCYF did not inform respondents in a timely manner of an eye surgery Nolan was scheduled to undergo. However, considering the totality of the circumstances—including Ms. Slavin's testimony that she contacted Brittaney "soon after" Ms. Slavin had learned about the scheduled surgery—we are unpersuaded that this incident alone is enough to tip the scales against DCYF in determining whether it had made reasonable efforts in this case.

Finally, the trial justice also faulted DCYF for failing to increase respondents' visitation with Nolan, despite the undisputed evidence that respondents' visits with Nolan were positive and that Nolan was bonded with his parents. In doing so, the trial justice again overlooked material evidence related to the issue of visitation—including evidence supporting his own factual findings—and absolved respondents of any responsibility to engage in efforts that would put them on the path to reunification with Nolan.

First, the trial justice overlooked uncontroverted testimony by Ms. Slavin that in September 2016, ten months after Nolan was removed from respondents' care, DCYF increased respondents' visitation with Nolan to two visits per week due to respondents consistently providing compliant screens. DCYF admittedly never further increased visitation after that time. However, the record and the trial justice's own findings make clear that the April 13, 2017 Family Court decree provided that

any future increase in respondents' visitation with Nolan depended upon respondents demonstrating progress with their substance-use disorders through compliance with treatment and twice-weekly supervised screens.

Though the trial justice took judicial notice of the April 13, 2017 Family Court decree, he overlooked its significance when considering DCYF's efforts with respect to visitation. The trial justice's own factual findings indicate that the parents did not demonstrate compliance with the April 13, 2017 Family Court decree: Respondents delayed engaging in treatment at CODAC until May 2017, and the record indicates that, until starting treatment, neither respondent had continuously provided the requisite weekly screens with the Family Court.

Once respondents began treatment, neither consented to CODAC releasing information to DCYF until May 31, 2017. Due to this delay, the earliest that DCYF could provide funding to cover a second weekly screen—as required by the court order—was June 11, 2017. Further, the earliest that DCYF received a screen report from CODAC was June 26, 2017. Ms. Slavin testified that CODAC was chosen as a treatment provider because there was no waiting list and respondents could begin treatment immediately in February 2017, after the court proceedings on the neglect petition and before the formal entry of the resulting decree in April. They nevertheless delayed treatment, and ultimately did not give themselves enough time

- 19 -

to demonstrate sufficient progress to earn increased visitation with Nolan prior to DCYF filing the termination petition in July 2017.

The respondents' arguments in support of the trial justice's decision are unavailing. Before this Court, respondents rely on this Court's opinion in *In re Steven D.*, cited previously, in support of their assertion that DCYF was required— but failed—to offer alcohol-specific treatment options, even though alcohol use was identified as a barrier to reunification from the time Nolan was taken into DCYF care and custody. *See In re Steven D.*, 23 A.3d at 1157. The respondents highlight the following exchange from trial, involving testimony from Elias's CODAC substance-abuse counselor, Melissa McKenna:

> "[Guardian *Ad Litem*:] Are you currently working with [Elias]?
>
> "[Ms. McKenna:] Yes.
>
> "[Guardian *Ad Litem*:] And what specific issues are part of your treatment plan at the moment?
>
> "[Ms. McKenna:] Whatever we both mutually agree upon; just that he decreases his dependence on the methadone program and earns take-homes.
>
> "[Guardian *Ad Litem*:] Okay. I'm going to need you to elaborate a little bit on that. Decrease his?
>
> "[Ms. McKenna:] Dependence on the program; meaning, that he does well and gets off of the program eventually.
>
> "[Guardian *Ad Litem*:] And that's for the methadone maintenance program, correct?

"[Ms. McKenna:] Yes.

"[Guardian *Ad Litem*:] And so, no part of the treatment is for any other substances?

"[Ms. McKenna:] It can be, but we are an opiate replacement facility. We are an opiate treatment facility.

"[Guardian *Ad Litem*:] So, if alcohol was an issue, that wouldn't be something that you would address?

"[Ms. McKenna:] We would address it, but we are not qualified to treat it there.

"[Guardian *Ad Litem*:] In what way would you address something like that?

"[Ms. McKenna:] Have the conversation about what they're willing to do.

"[Guardian *Ad Litem*:] Any outside referrals?

"[Ms. McKenna:] Possibly."

To the extent that our holding in *In re Steven D.* is relevant in this case, in light of the record as a whole, we do not accept the just-quoted testimony as dispositively establishing that DCYF offered no services for alcohol-use disorder. In *In re Steven D.*, DCYF failed to offer formal substance-abuse counseling services to a parent struggling with alcohol-use disorder. *In re Steven D.*, 23 A.3d at 1157. By contrast, the record in this case reveals that DCYF—as part of the parents' case plan—identified Alcoholics Anonymous as a suitable support system to help respondents maintain a substance-free lifestyle. Moreover, respondents struggled

- 21 -

with both opiate- and alcohol-use disorders and were offered and received substance-abuse treatment through CODAC—treatment that included monthly meetings with substance-use-disorder counselors, counseling on the dangers of mixing methadone and alcohol, and alcohol-use monitoring as needed.

We also—as we must—consider respondents' lack of cooperation in allowing DCYF to obtain information about the full extent of their diseases. Had respondents cooperated in the court-ordered screens and signed the appropriate releases from the start, DCYF may have had the opportunity, as early as late 2015, to identify whether respondents needed specialized alcohol-use-disorder treatment in addition to the services identified. Considering the totality of the circumstances, we are satisfied that the services DCYF identified and offered to respondents in this case, over a span of seventeen months, were "'reasonable' in the sense of being capable of remedying the particular problem(s) that caused the [child] to be removed." *In re Steven D.*, 23 A.3d at 1156 (quoting *In re Natalya C.*, 946 A.2d at 203).

The respondents further assert that they should not be faulted for their attorney's failure to respond to DCYF's inquiries. We reject this assertion. The respondents may not hide behind their attorney to avoid the requirement that there be "a demonstrated showing of an effort on the part of the parent." *In re Elana W.*, 249 A.3d at 294.

In 1980 the United States Congress enacted the Adoption Assistance and Child Welfare Act of 1980 (AACWA), which conditioned federal funding for family services on the states' implementation of child welfare programs that, in part, required the provision of "reasonable efforts * * * to make it possible for the child to return to his home[.]" P.L. 96-272, § 471(a)(15), codified at 42 U.S.C. § 671. Seventeen years later, Congress amended the AACWA by passing the Adoption and Safe Families Act of 1997 (ASFA), which, for the first time, defined "reasonable efforts" at the federal level, and placed the child's health and safety at the center of reasonable-efforts determinations. *See* P.L. 105-89, § 101(a). ASFA clarified that, "if continuation of reasonable efforts * * * is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made * * * to complete whatever steps are necessary to finalize the permanent placement of the child[.]" *Id.* ASFA also amended the AACWA to require states to initiate the termination of parental rights when a child has been in foster care under the responsibility of the state for fifteen of the most recent twenty-two months. P.L. 105-89, § 103(a)(3), codified at 42 U.S.C. § 675(5)(E).

The policy embedded in the ASFA amendments and in § 15-7-7(a)(3) reflects a recognition that, at some point, the child's need for permanency must outweigh other interests. Moreover, these provisions provide clear notice to *all* stakeholders in the child's welfare, including parents and their attorneys, that once a child is

removed from the home, time is of the essence. To this end, DCYF, as the "single authority" in this state "to establish and provide a diversified and comprehensive program of services for the social well-being and development of children and their families[,]" G.L. 1956 § 42-72-2(5), undoubtedly must make all reasonable efforts to reunify parents with their child; however, all parties involved are stakeholders in the health and well-being of the family. Parents may not—while their child remains in the care and custody of DCYF for over a year—ignore attempts by DCYF to reunify the family, and later complain that DCYF did too little.

We hold that the record of this case demonstrates that DCYF made reasonable efforts to reunify Brittaney and Elias with Nolan, sufficient to satisfy its statutory burden. The trial justice was clearly wrong to conclude otherwise.

## Parental Unfitness

It is well established that, "[b]efore terminating a parent's rights to his or her child, the Family Court justice must find that the parent is unfit." *In re Gelvin B.*, 251 A.3d at 509. Though the trial justice did not explicitly find respondents to be unfit in the present case, he acknowledged in his initial decision that, based on the record, "one could easily reach the conclusion that this case shouts out for an end to the parental rights of [the parents]."

"A parent is deemed unfit when the parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for

- 24 -

the parent to care for the child for an extended period of time." *In re Gelvin B.*, 251 A.3d at 509 (quoting *In re Violet G.*, 212 A.3d at 166). We have held that "a parent's lack of interest in his or her child evidenced by an unwillingness to cooperate with DCYF services can be a basis for a finding of unfitness." *Id.* (quoting *In re James H.*, 181 A.3d 19, 26-27 (R.I. 2018)). Moreover, as set out previously herein, § 15-7-7(a)(3) mandates the termination of parental rights when a child has been in the care and custody of DCYF for twelve months, if the parents were offered services, and "there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

Our thorough review of the record in this case leads to the conclusion that, in ignoring his own factual findings—and in failing to engage in an analysis with respect to the issue of respondents' lack of cooperation with DCYF's efforts—the trial justice also erred in ignoring respondents' lack of cooperation as a basis for unfitness. The trial justice overlooked respondents' lack of cooperation, his own factual determination that "[t]here has been an abundance of evidence presented about the parents and their engagement or lack of engagement in repeated continuous efforts to secure the return of their child[,]" and his acknowledgement that, at the time he rendered his decision in 2020, Nolan had been in the care and custody of DCYF for nearly five years and still did not have a permanent home.

We reiterate that the trial justice's findings of fact by clear and convincing evidence demonstrate that respondents did not cooperate with DCYF from the start of their involvement with DCYF in 2015. Rather, they ignored DCYF's attempts to formulate case plans; frustrated DCYF's attempts to provide services designed to remedy the reasons Nolan was removed from the home and to obtain information on respondents' treatment progress; and failed to begin to engage in substance-abuse counseling until seventeen months after Nolan was removed from their home.

Moreover, the trial justice's findings by clear and convincing evidence demonstrate that, once respondents began treatment at CODAC in May 2017, they demonstrated only minimal progress in their treatment. Both parents required intensified treatment plans well into 2018, three years after Nolan was taken into the care and custody of DCYF. More importantly, respondents only sporadically cooperated with DCYF to provide the court-ordered twice-weekly screens; more often than not, respondents prevented DCYF from obtaining information on any treatment progress they might have made. The record reveals that, from the start of this case and, significantly, throughout 2017 and 2018, respondents continued to demonstrate a "lack of interest in [their] child evidenced by an unwillingness to cooperate with DCYF services[.]" *In re Gelvin B.*, 251 A.3d at 509 (quoting *In re James H.*, 181 A.3d at 26-27); *cf. In re Christina V.*, 749 A.2d 1105, 1110 (R.I. 2000) ("[A] parent's refusal to cooperate with mandatory, court-ordered services *after* an

adjudication of neglect or abuse, and a parent's lack of cooperation with DCYF *before* such an adjudication represent significantly different behaviors under the law. The former can certainly constitute one basis for terminating parental rights, but the latter only should be a factor that the court takes into consideration—along with the totality of other relevant circumstances * * *.").

There can be no doubt that respondents' behavior during the pendency of this case, demonstrated by clear and convincing evidence, was seriously detrimental to Nolan and supported a finding of parental unfitness by clear and convincing evidence, particularly considering the child's age and need for permanency. *See* § 15-7-7(a)(3). We do not expect perfection of parents. Indeed, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Moreover, there can be no doubt that the permanency timelines embraced by ASFA and § 15-7-7(a)(3) are particularly onerous on parents who struggle with substance abuse. Indeed, federal legislation enacted in 2018 amended ASFA to incentivize states to create programs to assist parents struggling with addiction while delaying or preventing the child's removal in the first place. *See* P.L. 115-123, § 50711, codified at 42 U.S.C. § 671(e).

Ultimately, however, this only serves to underscore the utmost urgency with which all stakeholders involved in the health and well-being of a family must act when a child is removed from their parents' care due to the parents' addiction to substances. Once the child is removed from the parents' care, time is of the essence for all involved to work to address the parent's disease within a reasonable period of time. Despite the inevitable uphill battle, it remains true that

> "[e]very child has a right to reasonable care and maintenance; to be free from abuse or neglect, with the hope of spending the remainder of his or her childhood in a family setting in which the child may grow and thrive. * * * 'Children are entitled to permanency; they should not have to wait for an indeterminate period of time to find out if their parents will successfully obtain and maintain a substance free lifestyle.'" *In re Amiah P.*, 54 A.3d 446, 454 (R.I. 2012) (quoting *In re Shawn M.*, 898 A.2d 102, 108 (R.I. 2006)).

Where a parent takes seventeen months to begin to address the problems that caused the child to be removed from the family home, makes little progress in addressing those problems, all while continuing to evade the requirements of a Family Court order setting forth a path to reunification, there can be no doubt that the parent has demonstrated unfitness. Rather, the parent has created a situation in which there is not "a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]" Section 15-7-7(a)(3). We therefore hold that

the trial justice overlooked and misconceived material evidence of parental unfitness in this case.

We acknowledge that we take an unusual step in reaching the issue of parental unfitness in a case in which the trial justice did not reach the issue. However, Nolan is now nearly eight years old and has been in the care and custody of DCYF for more than six and a half years. It is also undisputed that Nolan had been in the care and custody of DCYF for greater than twelve months by the time DCYF filed the petition to terminate respondents' parental rights in July 2017. Moreover, as discussed previously, DCYF substantiated by clear and convincing evidence its attempts to make reasonable efforts to reunify respondents with Nolan. Therefore, contrary to the trial justice's conclusion otherwise, we are satisfied that DCYF proved by clear and convincing evidence the statutory requirements supporting the termination of the parental rights of Brittaney and Elias to Nolan.

DCYF urges this Court to remand the case to the Family Court with instructions to grant the petition to terminate. We decline, however, to reach the requisite analysis of the best interests of the child. Instead, having determined that DCYF has demonstrated the requisite reasonable efforts at reunification and parental unfitness, we remand the case to the Chief Judge of the Family Court with instructions to make findings relative to the best interests of the child and to resolve the petition within sixty days.

**Conclusion**

For the foregoing reasons, we vacate the decrees of the Family Court and remand the record to the Chief Judge of the Family Court for findings relative to the child's best interests within a period not to exceed sixty days. If the Chief Judge determines that the termination of respondents' parental rights is in the child's best interests, he shall enter a decree granting the petition.


**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | In re Nolan V-S. |
| **Case Number** | No. 2021-2-Appeal. (P 17-2555) |
| **Date Opinion Filed** | June 15, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Rossie Lee Harris, Jr. |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Deborah A. Palumbo<br>Department of Children, Youth, and Families<br><br>Karl Beauregard<br>Court Appointed Special Advocate |
| | For Respondents:<br><br>Stefanie DiMaio Larivee, Esq.<br><br>Kara J. Maguire<br>Office of the Public Defender |